**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**GOUYEN BROWN LOPEZ,**
9340 East Sleepy Hollow Road
Mesa, AZ 85207

**SINETTA LOPEZ, on behalf of herself and her
minor child L.B.,**
9340 East Sleepy Hollow Road
Mesa, AZ 85207

**NOMIE BROWN,**
175 Roja Drive
Globe, AZ 85501

**ANGELA KINSEY, on behalf of herself and her
minor children V.K. and M.K.,**
8734 North Ninth Avenue
Phoenix, AZ 85021

        *Plaintiffs*,

v.

**UNITED STATES OF AMERICA**,
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530

**UNITED STATES DEPARTMENT OF AGRI-
CULTURE,**
U.S. Department of Agriculture
1400 Independence Ave., SW
Washington, D.C. 20250-0003

**UNITED STATES FOREST SERVICE,**
U.S. Department of Agriculture
1400 Independence Ave., SW
Washington, D.C. 20250-0003

**BROOKE ROLLINS,**
U.S. Department of Agriculture
1400 Independence Ave, SW
Washington, D.C. 20250-0003

Civil Action No. 1:25-cv-02408-TJK

**STATEMENT OF POINTS AND
AUTHORITIES IN SUPPORT
OF THE APPLICATION FOR
PRELIMINARY INJUNCTION**

**TOM SCHULTZ,**
U.S. Department of Agriculture
1400 Independence Ave., SW
Washington, D.C. 20250-0003

     *Defendants*.

Miles E. Coleman*†
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 W. Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

  *application for admission pending
  †application for admission *pro hac vice* forthcoming

Christian J. Myers (Bar ID: 1658355)
Madeline Bergstrom*
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
(202) 689-2807
josh.myers@nelsonmullins.com
madeline.bergstrom@nelsonmullins.com

  *application for admission forthcoming

Jeffrey A. Wald†
NELSON MULLINS RILEY & SCARBOROUGH LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
jeffrey.wald@nelsonmullins.com

  †application for admission *pro hac vice* forthcoming

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... v

INTRODUCTION .................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 4

    A.  Oak Flat ....................................................................................................................... 4

    B.  Plaintiffs' religious practices ..................................................................................... 8

    C.  The taking of Oak Flat ............................................................................................. 10

    D.  Protections for Oak Flat .......................................................................................... 11

    E.  The land transfer ...................................................................................................... 12

    F.  The mine .................................................................................................................. 14

    G.  The lawsuits ............................................................................................................. 15

LEGAL STANDARD .............................................................................................................. 16

ARGUMENT ........................................................................................................................... 16

    I. Plaintiffs are likely to succeed on the merits ........................................................... 16

      A. The government's actions violate RFRA .............................................................. 16

        1. The government's actions impose a substantial burden on
           Plaintiffs' religious exercise. ......................................................................... 17

        2. The government's actions fail strict scrutiny. ............................................... 22

      B. The government's actions violate the Free Exercise Clause .............................. 24

        1. The government's actions trigger strict scrutiny by burdening
           Plaintiffs' First Amendment right to direct the religious upbringing
           of their children. ........................................................................................... 24

        2. The government's actions trigger strict scrutiny because they
           are neither neutral nor generally applicable. ................................................. 26

      C. The government's actions violate NEPA. ........................................................... 27

        1. The EIS violates NEPA's length requirement. ............................................ 28

2. The EIS fails to consider reasonable alternatives.........................................................28

D. The government's actions violate the NHPA. ....................................................................31

II. Plaintiffs satisfy the remaining preliminary injunction factors.................................................33

A.  Plaintiffs will be irreparably harmed. ..............................................................................33

B.  The public interest and balance of equities favor enjoining the land transfer. .................35

CONCLUSION..................................................................................................................................36

TABLE OF EXCERPTS FROM THE 2025 EIS .........................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Apache Stronghold v. United States*,
No. 21-15295, 2021 WL 12295173 (9th Cir. Mar. 5, 2021)............................................2, 19, 34

*Apache Stronghold v. United States*,
101 F.4th 1036 (9th Cir. 2024) ........................................................................................ *passim*

*\*Apache Stronghold v. United States*,
145 S. Ct. 1480 (2025)...................................................................................................... *passim*

*Bostock v. Clayton County*,
590 U.S. 644 (2020)................................................................................................................17

*Bowen v. Roy*,
476 U.S. 693 (1986)................................................................................................................25

*\*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)....................................................................................................16, 20, 23

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)...........................................................................................................26–27

*City of Boerne v. Flores*,
521 U.S. 507 (1997)................................................................................................................26

*City of Alexandria v. Slater*,
46 F. Supp. 2d 35 (D.D.C. 1999)............................................................................................30

*City of Tacoma v. FERC*,
460 F.3d 53 (D.C. Cir. 2006).................................................................................................31

*\*Comanche Nation v. United States*,
No. 08-cv-849, 2008 WL 4426621 (W.D. Okla. Sep. 23, 2008)......................................18, 19

*Employment Division v. Smith*,
494 U.S. 872 (1990).........................................................................................................21, 26

*Fellowship of Christian Athletes v. District of Columbia*,
743 F. Supp. 3d 73 (D.D.C. 2024).........................................................................................33

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
170 F.3d 359 (3d Cir. 1999)...................................................................................................26

*Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*,
  252 F.3d 246 (3d Cir. 2001)..........................................................................................31, 32–33

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021).....................................................................................................21, 23, 24

*Gonzales v. O Centro Espírita Beneficente*
  *Uniao do Vegetal*,
  546 U.S. 418 (2006)...........................................................................................................17, 22

*Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*,
  377 U.S. 218 (1964)...................................................................................................................23

*Int'l Church of Foursquare Gospel v. City of San Leandro*,
  673 F.3d 1059 (9th Cir. 2011) ..................................................................................................27

*Kaemmerling v. Lappin*,
  553 F.3d 669 (D.C. Cir. 2008).......................................................................................17, 18, 22

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020)...................................................................................................35

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022)...................................................................................................................26

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976)...................................................................................................................27

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)..................................................................................................16, 33

*Lee v. Thornburgh*,
  877 F.2d 1053 (D.C. Cir. 1989).................................................................................................32

*Lyng v. Nw. Indian Cemetery Protective Association*
  485 U.S. 439 (1988).............................................................................................................21, 25

*\*Mahmoud v. Taylor*,
  145 S. Ct. 2332 (2025)........................................................................................................2, 24, 25

*Media Matters for Am. v. Paxton*,
  138 F.4th 563 (D.C. Cir. 2025)..................................................................................................33

*Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983)...................................................................................................................27

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
  177 F.3d 800 (9th Cir. 1999) .....................................................................................................31

*Nat'l Capital Presbytery v. Mayorkas*,
    567 F. Supp. 3d 230 (D.D.C. 2021) ................................................................17, 20–21, 22

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................................................35

*Nw. Indian Cemetery Protective Ass'n v. Peterson*,
    795 F.2d 688 (9th Cir. 1986) ..............................................................................................27

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ................................................................................16, 33, 35

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ......................................................................................................27, 29

*Roman Catholic Bishop v. City of Springfield*,
    724 F.3d 78 (1st Cir. 2013) .................................................................................................27

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) ....................................................................................................33–34, 35

*\*Seven Cnty. Infrastructure Coal. v. Eagle County*,
    145 S. Ct. 1497 (2025) ..................................................................................................27, 28

*\*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) ........................................................................................ *passim*

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ..............................................................................................................26

*Tanzin v. Tanvir*,
    592 U.S. 43 (2020) ........................................................................................................17, 33

*Thai Meditation Ass'n of Ala. v. City of Mobile*,
    980 F.3d 821 (11th Cir. 2020) ............................................................................................18

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ............................................................................................................21

*\*Wilson v. Block*,
    708 F.2d 735 (D.C. Cir. 1983) ...........................................................................................19

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ............................................................................................................24

*Yellowbear v. Lampert*,
    741 F.3d 48 (10th Cir. 2014) .............................................................................................18

**Statutes**

5 U.S.C. § 706...........................................................................................................28, 33

42 U.S.C. § 1996...............................................................................................................35

42 U.S.C. § 2000bb.............................................................................................17, 20, 21

42 U.S.C. § 2000bb-1 ................................................................................................ *passim*

42 U.S.C. § 2000bb-2 .....................................................................................................2, 20

42 U.S.C. § 2000bb-3 ...............................................................................................1, 17, 20

42 U.S.C. § 2000cc-5 ......................................................................................................2, 20

42 U.S.C. § 4321...............................................................................................................27

42 U.S.C. § 4332.........................................................................................................3, 28

42 U.S.C. § 4336a.......................................................................................................3, 28

54 U.S.C. § 306108.....................................................................................................3, 31

Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act
    for Fiscal Year 2015, § 3003, 128 Stat. 3292 ......................................................12, 13, 14, 27

Treaty with the Apaches (July 1, 1852), 10 Stat. 979....................................................10

**Other Authorities**

36 C.F.R. § 800.................................................................................................................31

36 C.F.R. § 800.1........................................................................................................3, 31

36 C.F.R. § 800.7...............................................................................................................31

20 Fed. Reg. 7,319 (Oct. 1, 1955)...................................................................................11

36 Fed. Reg. 18,997 (Sep. 25, 1971) ..............................................................................11

*About Chinalco, Overview*, Aluminum Corp. of China.................................................12

David Wallace Adams, *Education for Extinction: American Indians and the
    Boarding School Experience, 1875-1928* (1st ed. 1995) .........................................11

Claire Barrett, *"The Sistine Chapel of Apache Religion": Tribe Fighting to Save
    Its Sacred Land*, HistoryNet (Apr. 22, 2021)...........................................................10

Letter from Rick Gonzalez, ACHP Vice Chairman, to Hon. Tom Vilsack, Sec'y of
    Agric. (Mar. 29, 2021) ....................................................................................................31, 32

Neil Hume, *Rio faces rebellion from biggest shareholder*, Financial Times
    (Apr. 10, 2019)......................................................................................................................12

Hiram Price, *Indian Offenses*, Department of the Interior, Office of Indian Affairs
    (Mar. 30, 1883), https://commons.und.edu/indigenous-gov-docs/131/The............................11

Gilbert King, *Geronimo's Appeal to Theodore Roosevelt*, Smithsonian Magazine,
    Nov. 9, 2012...........................................................................................................................11

Katherine E. Lovett, *Not All Land Exchanges Are Created Equal: A Case Study of
    the Oak Flat Land Exchange*, 28 Colo. Nat. Res., Energy & Envtl. L. Rev. 353
    (2017).....................................................................................................................................12

Lydia Millet, *Selling Off Apache Holy Land*, N.Y. Times (May 29, 2015) .................................12

Native Voices, *Timeline, 1886: Apache armed resistance ends; Geronimo
    surrenders*, U.S. National Library of Medicine......................................................................11

Parliament of the Commonwealth of Australia, Joint Standing Committee on
    Northern Australia, *Never Again* (Dec. 2020) .........................................................................12

*Resolution Copper: Hearing on H.R. 1904, The Southeast Arizona Land
    Exchange and Conservation Act of 2011, and S. 409, The Southeast Arizona
    Land Exchange and Conservation Act of 2009, Before the S. Comm. on
    Energy & Nat. Res*, 112th Cong. (2012)................................................................................26

*Resolution Copper Project & Land Exchange Environmental Impact Statement:
    Project Update*, U.S. Department of Agriculture (Mar. 1, 2021)...........................................35

Response Letter from Brooke L. Rollins, USDA Sec'y, to Reid Nelson, ACHP
    Exec. Dir. (Apr. 17, 2025) .....................................................................................................32

USDA, Forest Service, *Resolution Copper Project & Land Exchange
    Environmental Impact Statement: Project Update* (Mar. 1, 2021)..........................................14

John R. Welch, *Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in
    Central Arizona, 1859-1874*, 7 SAGE Open, Oct.-Dec. 2017..........................................10, 11

Tisa Wenger, *Fighting for Oak Flat: Western Apaches and American Religious
    Freedom*, 39 J.L. & Religion 247 (2024)..........................................................................4–5, 7

## INTRODUCTION

For centuries, Western Apaches have centered their worship at an ancient sacred site called *Chí'chil Biłdagoteel*, or Oak Flat. Oak Flat is the Apaches' direct corridor to the Creator and the site of sacred rituals that are uniquely tied to that place and cannot be replicated elsewhere. The federal government has long recognized the significance of Oak Flat and protected Apache rituals there—reserving Oak Flat from mining and placing it in the National Register of Historic Places. Yet in just 25 days (August 19, 2025), the government plans to transfer Oak Flat to a foreign-owned copper mining company for the sole purpose of constructing a mine that will physically destroy the site, swallowing it in a massive crater and ending Apache religious practices forever.

The government admits that the mine will destroy Oak Flat: the destruction will be "immediate, permanent, and large in scale"; all "public access" to the site will be "lost"; and nothing can "replace or replicate the tribal resources and [traditional cultural properties] that would be destroyed." USDA, 3 *Final Environmental Impact Statement: Resolution Copper Project & Land Exchange* 892 (June 2025) (*i.e.*, 3-EIS-892), https://www.resolutionmineeis.us/documents/final-eis; 1-EIS-153, 327. The government also admits that the copper could be mined using "alternative underground mining methods" that would not crater Oak Flat's surface; but the government declined to require these alternatives, or even consider them, on the ground that using them would "reduce the amount of ore that could be profitably mined." 4-EIS-F-3, F-4. In other words, the government has authorized the complete physical destruction of an irreplaceable Native American sacred site solely to increase the profits of a foreign-owned mining company.

This wanton, intentional, and needless destruction of Oak Flat violates multiple federal laws and the U.S. Constitution.

*First*, it violates the Religious Freedom Restoration Act (RFRA). RFRA provides that the federal government may not "substantially burden" a person's religious exercise unless the government demonstrates that imposing that burden is "the least restrictive means of furthering" a "compelling governmental interest." 42 U.S.C. § 2000bb-1(b). By its terms, RFRA applies to "all Federal law," *id.* § 2000bb-3(a), including laws disposing of federal real property, and it expressly

defines the "exercise of religion" to include "[t]he use … of real property for the purpose of religious exercise," *id.* § 2000bb-2, 2000cc-5(7)(B). Thus, six federal appellate judges and two Supreme Court Justices have already opined that destroying Oak Flat would substantially burden Western Apaches' religious exercise. *See Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480 (2025) (Gorsuch, J., joined by Thomas, J., dissenting from denial of certiorari) ("Gorsuch & Thomas") (citing *Apache Stronghold v. United States*, 101 F.4th 1036, 1131 (9th Cir. 2024) (en banc) (Murguia, C.J., dissenting)); *Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting). And the government has never even attempted to show that destroying Oak Flat is the least restrictive means of furthering a compelling governmental interest. Nor can it. Thus, the government's actions violate RFRA.

*Second*, the destruction of Oak Flat violates the First Amendment right of Apache parents to direct the religious upbringing of their children. In *Mahmoud v. Taylor*, the Supreme Court held that "the right of parents 'to direct the religious upbringing of their' children would be an empty promise if it did not follow those children" onto government property. 145 S. Ct. 2332, 2351 (2025). Accordingly, the Court held that reading LGBTQ-inclusive storybooks to children in public schools, without notifying parents or allowing the children to opt out, posed a "'very real threat of undermining' the religious beliefs that the parents wish to instill in their children," even though the government's actions were "subtle." *Id.* at 2355. Here, there is nothing "subtle" about it: the government is destroying a sacred site that is uniquely irreplaceable and necessary to the Apache faith, without which Apache parents can never initiate their children in Apache religious ways. Thus, the destruction of Oak Flat is nothing less than "the destruction of [a religious] community"—which all nine Justices in *Mahmoud* agreed was plainly unconstitutional. *Id.* at 2392 & n.8 (Sotomayor, J., dissenting).

*Third*, the destruction of Oak Flat violates the Free Exercise Clause because the government's actions are neither neutral toward religion nor based on a generally applicable law. Far from being the unanticipated, incidental effect of a religion-blind law, the government has made a calculated, discretionary, and individualized decision about a single piece of land—intentionally favoring the

secular use of copper mining over religious use by Apaches. That sort of discretionary decision to favor secular conduct over religious conduct triggers strict scrutiny, which the government cannot satisfy.

*Fourth*, the government's EIS violates the National Environmental Policy Act (NEPA). A 2023 amendment to NEPA provides that an EIS "shall not exceed 150 pages," except for projects of "extraordinary complexity," in which case an EIS "shall not exceed 300 pages." 42 U.S.C. § 4336a(e)(1). Here, the EIS is over 1,000 pages—plainly violating the statute. Even then, the EIS is also woefully underinclusive. While providing many pages of useless information, the EIS fails at the most basic task of considering reasonable alternatives to the proposed agency action, including admittedly feasible alternative mining methods that would be far less destructive of Oak Flat. 42 U.S.C. § 4332(C)(iii), (F).

*Fifth*, the transfer of Oak Flat violates the National Historic Preservation Act (NHPA). The NHPA requires the government to identify historical sites that may be harmed by federal projects, and to mitigate and avoid harm to those sites. 54 U.S.C. § 306108; 36 C.F.R. § 800.1(a). Oak Flat is unquestionably a site of immeasurable historical value, as evidenced by (*inter alia*) its listing in the National Register of Historic Places. Yet the government has failed to follow the processes set out in the NHPA. It has pushed the transfer forward over the opposition of the NHPA-created Advisory Council on Historical Preservation (ACHP) and has ignored the alternative approaches suggested by the ACHP that would prevent subsidence and mitigate harm to the historical sites that will be destroyed by the mine. This disregard of the ACHP and its proposed mitigation violates the NHPA.

\*         \*         \*

This nation has a tragic history of destroying Apache lives and land for the sake of mining interests. That history should not be repeated here. Multiple federal laws protect Apache religious practices at Oak Flat. The Court should enforce those laws and enjoin the transfer and destruction of Oak Flat.

## FACTUAL BACKGROUND

### A. Oak Flat

For centuries, Western Apaches and other tribes have worshipped at a sacred site called *Chí'chil Biłdagoteel* ("a broad flat of Emory oak trees") or Oak Flat. *See generally*, Coleman Decl. Ex. 1, *Chí'chil Biłdagoteel Historic District, Traditional Cultural Property, National Register of Historic Places Registration Form, NPS Form 10-900* at 4, 8, 14–22, 25–32, National Park Service (Jan. 2016), https://www.resolutionmineeis.us/sites/default/files/references/nez-2016.pdf ("NPS") (redactions in original).

Oak Flat is located within the Tonto National Forest about three miles east of present-day Superior, Arizona, between Apache Leap on the west and Ga'an Canyon (or Devil's Canyon) on the east. *Id.* at 42. Its terrain is characterized by old-growth oak groves, grassy basins, boulder fields, jagged cliffs, and rare perennial waters used by songbirds, mountain lions, foxes, bears, coatimundi, and deer. *Id.* at 5. Oak Flat "is particularly rich in traditional Apache resources, providing everything necessary for Apache survival." *Id.* at 28. This includes "hundreds of traditional Apache plants," abundant acorns ("the single most important traditional food today"), "rare holy medicines," and animals and minerals "that are crucial to Apache religion and culture." *Id.* In part because of this natural abundance, Oak Flat also features a singular concentration of "Apache [archaeological] sites located in one small area"—demonstrating that Oak Flat "has been persistently utilized and occupied for the past 1,500 years." *Id.* at 14–16.

As part of the Western Apache ancestral homeland, Oak Flat figures prominently in Apache history and cosmology. *Id.* at 8. It is often described as "the birthplace of [Western Apache] religion" or an Apache's "spiritual" or "religious home." Declaration of Sinetta Lopez ¶¶ 6, 17, 20 ("Sinetta"); Declaration of Nomie Brown ¶¶ 2, 9 ("Nomie"); Declaration of Gouyen Brown Lopez ¶ 26 ("Gouyen"); Declaration of Angela Kinsey ¶¶ 6, 8 ("Angela"). It is a dwelling place of powerful spiritual beings called Ga'an, who are holy spirits or messengers between the Creator and humans (Sinetta ¶ 20)—sometimes compared to angels in the Judeo-Christian tradition, but "bound up with a specific place" and unable "to exist without it." Tisa Wenger, *Fighting for Oak*

*Flat: Western Apaches and American Religious Freedom*, 39 J.L. & Religion 247, 248, 267 (2024) ("Wenger"); NPS at 25. As the dwelling place of the Ga'an, Oak Flat is a unique "source of supernatural power" (or *diyih*) and "the direct corridor to the Creator." Nomie ¶ 17; NPS at 8, 27; *see also* Angela ¶¶ 7–8; Gouyen ¶¶ 5, 23, 28; Sinetta ¶ 6. As such, Oak Flat is the site of essential religious ceremonies that are tied to that place and cannot be replicated elsewhere. Wenger at 248 (Oak Flat is "the only place where certain prayers, offerings, and ceremonies can be conducted").

One ceremony that occurs at Oak Flat is called the Holy Ground Ceremony. This is a blessing ceremony that a medicine man conducts for protection from sickness and perils. *Id.* at 259–60. It has been performed in its current form at Oak Flat for at least 100 years, but it reflects and builds on much older practices. *Id.* at 257–58. The current version of that ceremony dates back at least to the 1920s and the Apache prophet Silas John, whose movement "very clearly included ceremonies at *Chi'chil Biłdagoteel* [Oak Flat]." *Id.* The federal government actively suppressed the Holy Ground movement by forbidding Silas John's dances and jailing him. *Id.* at 259. Nevertheless, Apache families continued to hold Holy Ground Ceremonies at Oak Flat in the late 1940s or early 1950s, and they still do today. *Id.* The ceremony takes place at Oak Flat because "[t]he presence of the Gáán … makes the plants, herbs, and medicines gathered at Chi'chil Biłdagoteel more potent for both medicinal and ceremonial use." *Id.* at 261; *see also* Sinetta ¶ 18 (healing from sacred spring waters at Oak Flat); Nomie ¶ 4 (healing from blessings and prayers said at Oak Flat).

The Sunrise Ceremony is a rite of passage for Apache girls. Gouyen ¶ 7. This coming-of-age ceremony takes months of planning, entails several days of celebration, and often unites families and clans from all four Western Apache reservations. *Id.* ¶ 7; NPS at 32. To prepare for her Sunrise Ceremony, the girl moves onto Oak Flat and uses materials from Oak Flat to build a traditional Apache house, called a wickiup, where she lives for the duration of the ceremony. Gouyen ¶ 9; Nomie ¶ 6. She gathers the elements of the ceremony from the holy ground at Oak Flat, thanking Mother Earth for her resources. Gouyen ¶ 22. The medicine man gives the girl traditional buckskin clothing and a cane he has prepared for her, and tribal members surround her with singing, dancing, and prayer. Gouyen ¶¶ 13–18. On the second night, the Ga'an arrive. *Id.* ¶ 19. Five girls dance

behind the Ga'an dancers, representing how the Ga'an are there to help and guide them through life. *Id.* On the final day, the girl is painted with a special white paint made from the ground at Oak Flat; as she dances, she embodies the White Painted Woman, the matriarch of the Apache people who came from the ground at Oak Flat. Gouyen ¶¶ 20–21. At the end of the ceremony, when the girl's godmother wipes the clay from her eyes, she is an Apache woman, forever connected with the spirit of Oak Flat. *Id.* ¶ 23; Nomie ¶¶ 8, 15, 17.



Oak Flat is also the site of several natural springs, which are rare in this arid region, and which are sources of spiritual power for Apaches. NPS at 5, 27; 1-EIS-16. One example is *Tú Nahikaadi* (Dripping Spring), a dripping spring within a cave, which has a unique role in Apache tradition. NPS at 32; Wenger at 250–51. According to Apache tradition, a great flood scoured the world, and the matriarch of the Apache people, White Painted Woman or Changing Woman, survived the flood and took refuge in a cave with a dripping spring. *Id.*; Sinetta ¶ 20. She emerged alone into this world, and her children, conceived with the Sun, received guidance from the Ga'an on how to live in this land. Wenger at 250–51. Western Apaches continue to visit Dripping Spring for sacred rituals today, *id.* at 262–63, and the Apache girl in a Sunrise Dance embodies Changing Woman as she dances her way to womanhood, Gouyen ¶¶ 20, 22.

Oak Flat is also the site of *Tséyaa Gogeschin* (translated Written or Painted under the Rocks), a large rock overhang with ancient pictographs and petroglyphs—rock art that holds special meaning for Apache medicine people and provides an irreplaceable living connection to Apache ancestors. NPS at 32; Sinetta ¶ 7. The Chairman of the San Carlos Apache Tribe has described this artwork as "the footprints and the very spirit of our ancestors, hallmarks akin to the art found in gothic cathedrals and temples, like the Western Wall in Jerusalem [or] St. Peter's Basilica in Vatican City … . This is why I call Oak Flat the Sistine Chapel of Apache religion." 6-EIS-U-9.

While marking off specific boundaries of a sacred place is in tension with Apache ways (NPS at 11), the following map identifies the area where the critical sites described above are located—including the sacred ceremonial grounds, oak groves, sacred springs, medicine-gathering areas, and ancient petroglyphs (*see* Sinetta ¶ 4):



**B. Plaintiffs' religious practices**

The Plaintiffs in this case are Apache women and girls whose religious practices center on Oak Flat and who would be unable to practice their religion if Oak Flat is destroyed.

Plaintiff Gouyen Brown had her Sunrise Ceremony at Oak Flat. Gouyen ¶¶ 6, 8–25. During that ceremony, she experienced a profound spiritual connection with Mother Earth and with her ancestors. *Id.* ¶ 23. It is where she became a new woman. *Id.* ¶ 24. She continues to return to Oak Flat to pray, gather medicine, and participate in religious ceremonies. *Id.* ¶ 26. She hopes and intends that her own future children will be able to connect with the Creator at Oak Flat, and that her daughters will be able to have their Sunrise Ceremonies at Oak Flat. *Id.* If Oak Flat is destroyed, she would be devastated. She would be unable to continue core religious practices and unable to bring up her children in Apache religious ways. *Id.* ¶¶ 24, 27.

Plaintiff Sinetta Lopez is an Apache woman and Gouyen's mother. She grew up coming to Oak Flat with her mother and grandmother, collecting berries, praying, and participating in sacred

ceremonies there. Sinetta ¶¶ 3, 5. Oak Flat is central to her religious practices. As a single mother, Oak Flat is essential to how she brings up her daughters in the Apache way. *Id.* ¶¶ 8–23.

Sinetta also has a minor daughter, L.B. Sinetta's minor daughter has grown up at Oak Flat and has had dreams and encounters with spirits at Oak Flat and was healed of an illness by drinking water from a sacred spring at Oak Flat. *Id.* ¶ 18. She is planning her Sunrise Ceremony at Oak Flat for October and wants to remain connected with the Creator and with her ancestors through sacred ceremonies at Oak Flat. *Id.* ¶ 19.

Plaintiff Nomie Brown is an Apache woman who had her coming-of-age Sunrise Ceremony at Oak Flat. Nomie ¶ 5. That ceremony fundamentally changed her life, and she continues to return to Oak Flat to engage in prayer and religious ceremonies there today. *Id.* ¶¶ 8, 10. Oak Flat is essential to her ongoing religious exercise and her identity as an Apache woman.

Plaintiff Angela Kinsey is an Apache woman and mother who engages in religious practices at Oak Flat. Angela ¶¶ 2, 8. She grew up coming to Oak Flat with her grandmother and has participated in many religious ceremonies at Oak Flat, including serving as a godmother in a Sunrise Ceremony. *Id.* ¶¶ 5, 9. She has two minor daughters whom she continues to take to Oak Flat to show them where they came from and to pass on Apache traditions and religious ways. *Id.* ¶¶ 10-16. Oak Flat is the place where she is uniquely able to connect with the Creator. *Id.* ¶ 17.

Angela's older minor daughter, V.K., had her coming-of-age ceremony at Oak Flat. *Id.* ¶ 10. She has attended many ceremonies at Oak Flat, and attending and participating in those ceremonies is an essential part of her religious practices and identity as an Apache woman. *Id.* ¶ 8.

Angela's younger minor daughter, M.K., is four years old. *Id.* ¶ 10. Angela hopes and intends that M.K. will be able to have her coming-of-age ceremony at Oak Flat. *Id.* ¶ 15.

For Plaintiffs, Oak Flat in its entirety is a sacred and holy site. Oak Flat's protection is essential for the continued practice of Apache religious and cultural ways, and they oppose the government's plan to violate the integrity of Oak Flat through mining—which would cut off Plaintiffs' access to Oak Flat and make it impossible for them to carry out essential religious practices.

### C. The taking of Oak Flat

Before the United States existed, Oak Flat was Apache land. John R. Welch, *Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in Central Arizona, 1859-1874*, 7 SAGE Open, Oct.-Dec. 2017, https://journals.sagepub.com/doi/epub/10.1177/2158244017747016 ("Welch"); NPS at 8, 14–16. Beginning in the 1500s, other nations made claims to the land, including Spain and, later, Mexico. *See* Gorsuch & Thomas, 145 S. Ct. at 1482. The United States first purported to gain an interest in the area in 1848, when Mexico—defeated in the Mexican-American War—ceded its claim to the area in the Treaty of Guadalupe Hidalgo. *Id.* at 1482; 2-EIS-822.

In 1852, the United States entered the Treaty of Santa Fe with several Apache chiefs. Treaty with the Apaches art. 8 (July 1, 1852), 10 Stat. 979, 980, https://www.govinfo.gov/content/pkg/STATUTE-10/pdf/STATUTE-10-Pg979.pdf#page=2. To secure peace with the Apaches, the United States promised to "designate, settle, and adjust their territorial boundaries" and "pass and execute" laws "conducive to the prosperity and happiness of said Indians." *Id.*, art. 9. Although the formal designation of boundaries never occurred, the earliest map of the area, prepared by the Smithsonian Institution in 1899, shows Oak Flat as Apache territory, not belonging to the United States. Welch at 6.

The promised peace didn't occur either. Shortly after the 1852 Treaty, settlers and miners entered the area over Apache opposition, and U.S. soldiers and civilians repeatedly massacred Apaches. Welch at 7–8. In 1862, U.S. Army General James Carleton ordered Apache men to be killed wherever found. When miners discovered gold and silver nearby, General Carleton ordered the Apaches' "removal to a Reservation" or "utter extermination" to protect "all those who go to the country in search of precious metals." Welch at 8. By 1874, the government had forced 4,000 Apaches onto the San Carlos Reservation—nicknamed "Hell's 40 Acres" because it was a barren wasteland. Claire Barrett, *'The Sistine Chapel of Apache Religion': Tribe Fighting to Save Its Sacred Land*, HistoryNet (Apr. 22, 2021), https://www.historynet.com/the-sistine-chapel-of-apache-religion-tribe-fighting-to-save-its-sacred-land/. In 1883, the U.S. Commissioner of Indian Affairs issued the Code of Indian Offenses, prohibiting traditional Native American religious

practices on pain of imprisonment. Hiram Price, *Rules Governing the Court of Indian Offenses*, Department of the Interior, Office of Indian Affairs (Mar. 30, 1883), https://commons.und.edu/indigenous-gov-docs/131/. The government also forcibly removed hundreds of Apache children from their families, sending them to boarding schools aimed at rooting out their "savagism" and converting them to Christianity. David Wallace Adams, *Education for Extinction: American Indians and the Boarding School Experience*, *1875-1928* 6 (1st ed. 1995); Welch at 14.

After decades of conflict over their ancestral lands, the Chiricahua Apaches, led by Geronimo, surrendered in 1886 and agreed to be detained for two years in exchange for the return of their land. Gilbert King, *Geronimo's Appeal to Theodore Roosevelt*, Smithsonian Magazine, Nov. 9, 2012, https://www.smithsonianmag.com/history/geronimos-appeal-to-theodore-roosevelt-117859516/. But the government broke this promise, too. Instead, it held the Apaches prisoner for 23 years and eventually confined them to the San Carlos Reservation. Native Voices, *Timeline, 1886: Apache armed resistance ends; Geronimo surrenders*, U.S. National Library of Medicine, https://www.nlm.nih.gov/nativevoices/timeline/370.html.

The United States doesn't dispute this history. The EIS admits that Oak Flat is "part of the traditional territories of the Western Apache," who "lived on and used the resources of these lands," that the government took Oak Flat "by force 150 years ago," and that because of the government's actions, Western Apaches "lost large portions of their homelands, including Oak Flat, and today live on lands that do not encompass places sacred to their cultures." 3-EIS-873–75.

### D. Protections for Oak Flat

Beginning in the 20th century, the government took steps to protect Oak Flat. In 1905, the government created the Tonto National Forest, which includes Oak Flat. 2-EIS-823. In 1955, President Eisenhower reserved crucial portions of Oak Flat to protect it from mining. 20 Fed. Reg. 7,319, 7,336–37 (Oct. 1, 1955). In 1971, President Nixon renewed the protection. 36 Fed. Reg. 18,997, 19,029 (Sep. 25, 1971). And in 2016, the National Park Service placed Oak Flat in the National Register of Historic Places, recognizing "that *Chí'chil Biłdagoteel* is an important feature

of the Western Apache landscape as a sacred site, as a source of supernatural power, and as a staple in their traditional lifeway." NPS at 8.

### E. The land transfer

These protections came under pressure starting in 1995, when a large copper deposit was discovered 4,500 to 7,000 feet beneath Oak Flat. 1-EIS-ES-1. In 2004, two large multinational mining companies, Rio Tinto and BHP, formed a joint venture called Resolution Copper and began lobbying Congress to transfer Oak Flat so that Resolution could mine the deposit. Lydia Millet, *Selling Off Apache Holy Land*, N.Y. Times (May 29, 2015), https://archive.ph/ojJDL ("Millet). Rio Tinto's largest shareholder is Aluminum Corporation of China, a "state-owned enterprise" of the Chinese government.[1] And Rio has been widely condemned internationally for destroying indigenous sacred sites—including intentionally destroying 46,000-year-old caves constituting one of Australia's most significant cultural sites.[2]

Between 2005 and 2013, Congress considered at least twelve standalone bills to transfer Oak Flat to Resolution Copper. Katherine E. Lovett, *Not All Land Exchanges Are Created Equal: A Case Study of the Oak Flat Land Exchange*, 28 Colo. Nat. Res., Energy & Envtl. L. Rev. 353, 366–67 (2017). Each failed. *Id.* So, lacking congressional support for a standalone bill, Resolution and its allies tried a different tack: a last-minute rider to must-pass legislation. Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, § 3003(b)(2), (b)(4), (c)(1), (d), 128 Stat. 3292, 3293.

Each year, Congress passes the National Defense Authorization Act (NDAA), which is necessary legislation to fund the military. *Id.* In 2014, the NDAA was 698 pages long and authorized hundreds of billions of dollars in defense spending. *Id.* At the last minute, Arizona's Senators

---

[1]    *About Chinalco, Overview*, Aluminum Corp. of China, https://www.chinalco.com.cn/en/en_gywm/en_qyjj/; *see* Neil Hume, *Rio faces rebellion from biggest shareholder*, Financial Times (Apr. 10, 2019), https://archive.ph/MOCv6.

[2]    Parliament of the Commonwealth of Australia, Joint Standing Committee on Northern Australia, *Never Again*, at vi (Dec. 2020), https://culturalheritage.org.au/wp-content/uploads/2024/01/Never-Again.pdf ("Rio knew the value of what they were destroying but blew it up anyway … despite having options which would have preserved [the site].").

McCain and Flake attached to that bill the land-transfer provision—called the "Southeast Arizona Land Exchange and Conservation Act"—without a separate vote or debate. Millet, *supra*. The land-transfer provision then passed as Section 3003 of the NDAA.

Section 3003 authorizes the Secretary of Agriculture to transfer title to approximately 2,422 acres of Forest Service lands, including Oak Flat, to Resolution, in exchange for other parcels of land owned by Resolution scattered elsewhere in Arizona. § 3003(b)(2), (b)(4), (c)(1), (d)(1), 128 Stat. 3732–37. The land to be transferred to Resolution is shown here:



Section 3003 revokes the orders by Presidents Eisenhower and Nixon protecting Oak Flat. § 3003(i)(1)(A), 128 Stat. 3740. Section 3003 also instructs that, before conveying the federal land, the Secretary must "prepare a single environmental impact statement under the National Environmental Policy Act [NEPA] which shall be used as the basis for all decisions under Federal law related to the proposed mine." § 3003(c)(9)(B), 128 Stat. 3735–36. Section 3003 also requires the Secretary to "engage in government-to-government consultation with affected Indian tribes concerning issues of concern … related to the land exchange." § 3003(c)(3)(A), 128 Stat. 3733.

Following that consultation, the Secretary must consult with Resolution "and seek to find mutually acceptable measures to (i) address the concerns of the affected Indian tribes; and (ii) minimize the adverse effects on the affected Indian tribes resulting from mining and related activities." § 3003(c)(3)(B), 128 Stat. 3733.

Once the Secretary publishes a NEPA-compliant EIS, Section 3003 provides that "the Secretary shall convey all right, title, and interest of the United States" in Oak Flat "to Resolution Copper" within "60 days." § 3003(c)(10), 128 Stat. 3736.

### F. The mine

The government originally published an EIS on January 15, 2021. 1-EIS-ES-3. A few weeks later, the government withdrew that EIS—stating that it needed additional "time" to "fully understand concerns raised by Tribes." *Id.*; USDA, Forest Service, *Resolution Copper Project & Land Exchange Environmental Impact Statement: Project Update* (Mar. 1, 2021), https://www.resolutionmineeis.us/. The government eventually republished the EIS on June 20, 2025. USDA, *Final Environmental Impact Statement: Resolution Copper Project & Land Exchange* (June 2025).

The EIS confirms that the mine will destroy Oak Flat. *See generally* Table of Excerpts from the 2025 EIS, *infra* p. 38. The copper is located between 4,500 and 7,000 feet below Oak Flat's surface. 1-EIS-ES-1. To mine it, Resolution will use a technique called panel caving, which involves tunneling beneath the ore, fracturing it with explosives, and removing it from below. 1-EIS-13. Once the ore is removed, approximately 1.37 billion tons of toxic waste ("tailings") will need to be stored forever. 1-EIS-62. This will permanently bury or otherwise destroy many prehistoric and historic cultural artifacts, including human burials. 1-EIS-44. Oak Flat itself will collapse ("subside") into a crater almost 2 miles across and 800 to 1,115 feet deep. 1-EIS-ES-4. The following map shows the crater in relation to the ceremonial sites described above (*cf.* 1-EIS-65):

14



The EIS admits that the impacts of the mine will be "immediate, permanent, and large in scale" and that all "public access" to the site will be "lost." 3-EIS-892; 1-EIS-327. Among other things, the mine will destroy the places used for Sunrise, Holy Grounds, and other sacred ceremonies; old-growth oak groves and sacred medicinal plants; sacred springs, including Changing Woman Spring; burial grounds; and ancient religious and cultural artifacts, including the ancient petro-glyphs of *Tséyaa Gogeschin*. 1-EIS-ES-29, 1-EIS-44, 1-EIS-160; 6-EIS-U-3, 6-EIS-U-9–10. The destruction of Oak Flat will terminate the Apaches' access to the site, destroy the foods, medicines, springs, artifacts and locations that are essential to their religious practices, and make it physically impossible for the Apaches to ever engage in their core religious practices again. 1-EIS-160; 3-EIS-867–71; Gouyen ¶¶ 27–28; Sinetta ¶ 23; Nomie ¶¶ 16–17; Angela ¶ 17.

### G. The lawsuits

When the government initially published an EIS in 2021, three lawsuits challenged the ade-quacy of the EIS and the legality of the land transfer. Compl., *Apache Stronghold v. United States*, No. 2:21-cv-50 (D. Ariz. Jan. 12, 2021), ECF No. 1; Compl., *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 2:21-cv-68 (D. Ariz. Jan. 14, 2021), ECF No. 1; Compl., *Ariz. Mining Reform*

*Coal. v. U.S. Forest Serv.*, No. 2:21-cv-122 (D. Ariz. Jan. 22, 2021), ECF No. 1. Two of those lawsuits focused on the adequacy of the 2021 EIS and were stayed when the EIS was withdrawn on March 1, 2021. Order, *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 2:21-cv-68 (D. Ariz. Mar. 23, 2021), ECF No. 47; Order, *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 2:21-cv-122 (D. Ariz. Mar. 16, 2021), ECF No. 35. One of the lawsuits challenged the legality of the land transfer under the Religious Freedom Restoration Act and First Amendment and sought an emergency injunction. The district court declined to enjoin the transfer. *Apache Stronghold*, No. 2:21-cv-50, 2021 WL 689906 (D. Ariz. Feb. 22, 2021). The en banc Ninth Circuit affirmed by a 6-5 vote. *Apache Stronghold*, 101 F.4th 1036. And the Supreme Court declined to grant certiorari on May 27, 2025, over a dissenting opinion from Justices Gorsuch, joined by Justice Thomas. Gorsuch & Thomas, 145 S. Ct. 1480. Justices Gorsuch and Thomas explained that the Ninth Circuit's decision was "extraordinary," "highly doubtful as a matter of law," and turned on a rule that "[n]ot a single other Court of Appeals has" adopted." *Id.* at 1480, 1488.

A few weeks after the Supreme Court denied certiorari, the government on June 20, 2025, republished the EIS. It intends to transfer Oak Flat to Resolution on August 19, 2025.

## LEGAL STANDARD

A party moving for a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will likely suffer irreparable harm absent preliminary relief; (3) the balance of harms favors an injunction; and (4) the injunction will be in the public interest. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). "In First Amendment cases, the likelihood of success [on the merits] 'will often be the determinative factor' in the preliminary injunction analysis." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## ARGUMENT

### I.  Plaintiffs are likely to succeed on the merits.

#### A.  The government's actions violate RFRA.

Congress enacted RFRA "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014); *see Singh v. Berger*, 56 F.4th 88, 92–

16

93 (D.C. Cir. 2022). Under RFRA, the federal "Government shall not substantially burden a person's exercise of religion" unless it satisfies strict scrutiny. 42 U.S.C. § 2000bb-1(a)–(b). RFRA sidesteps the rule developed in *Employment Division v. Smith*, which permits laws that are neutral and generally applicable to burden religious exercise—instead applying even if government action is "'neutral' toward religion" and "of general applicability." 42 U.S.C. §§ 2000bb(a)(2), 2000bb-1(a). And RFRA is a "super statute," *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020), applying by its terms "to all Federal law, and the implementation of that law, whether statutory or otherwise." 42 U.S.C. § 2000bb-3(a); *see Singh*, 56 F.4th at 97–103 (applying RFRA to Marine Corps); *Nat'l Capital Presbytery v. Mayorkas*, 567 F. Supp. 3d 230, 240–46 (D.D.C. 2021) (applying RFRA to immigration law).

RFRA claims proceed in two steps. First, the plaintiff must show his "exercise of religion" has been "substantially burdened." *Gonzales v. O Centro Espírita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006). Second, "the burden is placed squarely on the Government" to prove that substantially burdening the plaintiff is "the least restrictive means" of furthering a "compelling governmental interest." *Id.* at 418, 429–30.

Here, the government's actions substantially burden Plaintiffs' religious exercise by barring access to and physically destroying the irreplaceable site at which Plaintiffs' religious practices must take place. And the government has not even attempted to satisfy strict scrutiny. Thus, Plaintiffs are likely to prevail on their RFRA claim.

### 1. The government's actions impose a substantial burden on Plaintiffs' religious exercise.

RFRA, like its sister-statute RLUIPA, does not define the term "substantial burden," so courts "turn to the phrase's plain meaning." *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). The D.C. Circuit has held that a "substantial burden" exists when government action exceeds a "*de minimis* burden on religious practice" and "puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs'" or "otherwise interfere[s] with" "religious act[s]." *Kaemmerling v. Lappin*, 553 F.3d 669, 678, 679 (D.C. Cir. 2008). As this definition suggests, a burden does not have to be

"complete, total, or insuperable" to count. *Thai Meditation Ass'n of Ala. v. City of Mobile*, 980 F.3d 821, 830 (11th Cir. 2020). But "government conduct" that does "completely prevent[ ]" the plaintiff's religious exercise "clearly satisfies" it. *Id.* "As a matter of ordinary meaning, after all, an action that prevents a religious exercise does not just burden that exercise substantially, it burdens it completely." Gorsuch & Thomas, 145 S. Ct. at 1486.

Here, the government is plainly "interfer[ing] with" "religious act[s]" in more than a "*de minimis*" way. *Kaemmerling*, 553 F.3d at 678, 679. Indeed, the government is "completely prevent[ing]" religious acts. *Thai Meditation*, 980 F.3d at 829. Plaintiffs perform specific religious acts that are uniquely tied to Oak Flat and cannot be replicated elsewhere. Gouyen ¶¶ 22-23; Sinetta ¶¶ 22-23; Nomie ¶ 17; Angela ¶ 17. Yet "'[i]t is undisputed' that the government's plan will permanently 'destroy the Apaches' historical place of worship, preventing them from ever again engaging in religious exercise' at Oak Flat." Gorsuch & Thomas, 145 S. Ct. at 1480; *see* Gouyen ¶¶ 26-28; Sinetta ¶ 23; Nomie ¶ 15. It is hard to imagine how a burden could be any more substantial. *See Yellowbear v. Lampert*, 741 F.3d 48, 55–56 (10th Cir. 2014) (Gorsuch, J.) (when government "*prevents* the plaintiff from participating in a[ ] [religious] activity," giving the plaintiff no "degree of choice in the matter," the government action "easily" imposes a substantial burden (emphasis added)). In fact, "one court after another has held that preventing a religious exercise is, necessarily, a 'substantial burden' on that religious exercise." Gorsuch & Thomas, 145 S. Ct. at 1488.

And indeed, the Supreme Court itself has recognized that preventing religious exercise through "*destruction of religious property*" can constitute a "RFRA violation[ ]." *Tanzin*, 592 U.S. at 51 (emphasis added). Other courts, including the D.C. Circuit, have already applied this principle to use of sacred sites on government-controlled land.

In *Comanche Nation v. United States*, for example, the Army planned to build a warehouse on federal land near Medicine Bluffs, a sacred site. No. 08-cv-849, 2008 WL 4426621, at \*17 (W.D. Okla. Sep. 23, 2008). But the warehouse would have occupied "the precise location" where Native Americans stood for worship near the Bluffs—making their traditional religious practices

impossible. *Id.* at \*7, \*17. The court held that this physical interference with plaintiffs' religious exercise "amply demonstrate[d]" a "substantial burden." *Id.*

Similarly, in the pre-RFRA Free Exercise Clause decision of *Wilson v. Block*, the D.C. Circuit considered whether the government had "burden[ed]" Native Americans "in the practice of their religion[ ]" by permitting the expansion of a ski resort on the San Francisco Peaks. 708 F.2d 735, 737–42 (D.C. Cir. 1983). The court held that "plaintiffs seeking to restrict government land use in the name of religious freedom must, at a minimum, demonstrate that the government's proposed land use would impair a religious practice that could not be performed at any other site." *Id.* at 744. But while the plaintiffs there held the Peaks "as a whole" "sacred," the permit encompassed only a "small portion of the Peaks"; thus, it did not impede the plaintiffs' "free entry onto the Peaks," and the plaintiffs had failed to show that the project would "prevent them from performing ceremonies or collecting objects that can be performed or collected in the [ski area] but nowhere else." *Id.*

This case is like *Comanche Nation* and unlike *Wilson*. As the government here acknowledges, the mine will obliterate "the precise location" where Plaintiffs hold sacred ceremonies at Oak Flat, leaving a nearly two-mile-wide, 1,100-foot-deep crater in its place. *Comanche Nation*, 2008 WL 4426621, at \*7, \*17. That action will "den[y] the plaintiffs" and other Apaches "access to" Oak Flat, and it will permanently foreclose specific religious exercises that take place there "but no-where else." *Wilson*, 708 F.2d at 744. As the EIS admits, this physical destruction of one-of-a-kind "[t]ribal sacred sites" will be "immediate," "permanent," and "[i]rreversible." 2-EIS-836–37. Thus, as six federal appellate judges and two Supreme Court Justices have already opined, the challenged action here "does not just burden" Apache religious exercise at Oak Flat "substan-tially"—"it burdens it completely." Gorsuch & Thomas, 145 S. Ct. at 1486; *see Apache Strong-hold*, 101 F.4th at 1131 (Murguia, C.J., dissenting); *Apache Stronghold*, 2021 WL 12295173, at \*2–3, \*4 & n.4, \*7 (Bumatay, J., dissenting).

Contrary to the en banc majority's contention in *Apache Stronghold*, *Lyng* does not change this straightforward analysis. *Apache Stronghold*, 101 F.4th at 1044. In *Apache Stronghold*, an en banc

panel majority of the Ninth Circuit agreed that in general the government "substantially burden[s]" religious exercise when it "prevent[s] access to" it. 101 F.4th at 1043. Nevertheless, a different majority declined to apply RFRA's plain meaning in favor of a novel theory that "substantial burden" has a special meaning that adopts an idiosyncratic interpretation of *Lyng* in just one context— cases involving federally managed land. *Id.* at 1044.

But as Justices Gorsuch and Thomas rightly observed, this theory is "difficult to reconcile with the statutory text," "highly doubtful as a matter of law," and "extraordinary" (not in a good way). Gorsuch & Thomas, 145 S. Ct. at 1486, 1480.

First, the Ninth Circuit's theory is contrary to RFRA's text. It is undisputed that the "ordinary meaning" of "substantial burden" includes a government action "that prevents a religious exercise." *Id.* at 1486. And "[e]xactly nothing in the phrase 'substantial burden'—or anything else in RFRA's text—hints that a different and more demanding standard applies when (and only when) the 'disposition' of the government's property is at issue." *Id.* Indeed, just the opposite: RFRA expressly "applies to all Federal law, and the implementation of that law"—with no exception for government real property. 42 U.S.C. § 2000bb-3(a); Gorsuch & Thomas, 145 S. Ct. at 1486. Even more, RFRA expressly defines the "exercise of religion" to include "[t]he use … of real property" for religious exercise. 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(B); Gorsuch & Thomas, 145 S. Ct. at 1486. These provisions cannot be squared with a special carveout from RFRA for government property.

Second, the Supreme Court has "never held" that RFRA "should be construed to 'subsum[e]'" pre-RFRA cases (like *Lyng*). Gorsuch & Thomas, 145 S. Ct. at 1486. Again, just the opposite: the Court "emphatically rejected that notion" as "absurd" in *Hobby Lobby*, emphasizing that "by enacting RFRA, Congress went far beyond what this Court ha[d] held [to be] constitutionally required" in prior cases. *Id.* (quoting *Hobby Lobby*, 573 U.S. at 706). Indeed, RFRA expressly restores "the compelling interest test as set forth" in two prior cases it cites by name (*Sherbert* and *Yoder*)—showing Congress knows how to incorporate prior cases when it wants to. 42 U.S.C. § 2000bb(b)(1). But RFRA does no such thing with *Lyng*. As this Court has emphasized: "RFRA

offers the right to freely exercise religion even '*greater* protection' than the Free Exercise Clause." *Mayorkas*, 567 F. Supp. 3d at 243.

Third, *Lyng* is a particularly ill-suited guide to the meaning of "substantial burden." As Justice Gorsuch noted: "Just search *Lyng* for the phrase 'substantial burden.' You will not find it." Gorsuch & Thomas, 145 S. Ct. at 1487. That's because *Lyng* isn't a substantial-burden case at all; it's a case, like *Employment Division v. Smith*, involving a "neutral" and "generally applicable" law. 494 U.S. 872, 881–85 (1990). And the Supreme Court has said just that. In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, the Court explained that, "[i]n recent years," the Court has "rejected free exercise challenges" where "the laws in question have been neutral and generally applicable"—and cited *Lyng* as the leading "example." 582 U.S. 449, 460 (2017); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 536 (2021). Far from applying a "substantial burden" test, *Lyng* said the burden was "incidental" and emphasized that the government's actions did not "discriminate against religions." 485 U.S. 439, 450, 453 (1988). This is the classic language of the neutral-and-generally-applicable test adopted in *Smith*—the very test RFRA is designed to displace. Gorsuch & Thomas, 145 S. Ct. at 1487; *see also* 42 U.S.C. §§ 2000bb(a)(2), 2000bb-1(a) (RFRA applies even if government action is "'neutral' toward religion" and "of general applicability").

Finally, even if *Lyng* were relevant to RFRA, it is easily distinguishable from this case, because the government in *Lyng* did not "destroy a religious site." Gorsuch & Thomas, 145 S. Ct. at 1487. *Lyng* repeatedly emphasized that the road was "removed as far as possible from [religious] sites," and "[n]o sites where specific rituals take place were to be disturbed." 485 U.S. at 443, 454. Thus, the plaintiffs weren't restricted from "visiting" the area or continuing their religious practices; rather, they claimed the road would "create distractions" rendering their practices spiritually "ineffectual." *Id.* at 448, 450, 452–53. This indicates that *Lyng*, to the extent it addressed the question of substantial burden at all (which it didn't), offers a much narrower proposition not implicated here: that plaintiffs can't prove a substantial burden by alleging solely "subjective spiritual harm,"

21

but must also identify objective interference with specific religious acts. *Apache Stronghold*, 101 F.4th at 1147 (Murguia, C.J., dissenting).

This approach similarly comports with this Circuit's substantial burden analysis in *Kaemmerling*. *See* Gorsuch & Thomas, 145 S. Ct. at 1488 (Ninth Circuit's decision "an outlier" and reflects a rule adopted by "[n]ot a single other Court of Appeals"). In *Kaemmerling*, the Court considered a prisoner's objection to the government storing his DNA. 553 F.3d at 678. He did not object to the collection of DNA, but to the government's possession and storage of his genetic information. *Id.* The D.C. Circuit found that he did not allege a substantial burden, because "[t]he government's extraction, analysis, and storage of Kaemmerling's DNA information does not call for Kaemmerling to modify his religious behavior in any way—it involves no action or forbearance on his part, nor does it otherwise interfere with any religious act in which he engages." *Id.* at 679. That perfectly illustrates the kind of burden that is based on purely subjective spiritual harms rather than any objective interference with the plaintiff's religious practices. Here, by contrast, the government's actions will directly interfere with specific Apache religious practices by swallowing their central place of worship in a crater, preventing their religious exercise altogether.

### 2. The government's actions fail strict scrutiny.

With a substantial burden shown, the government's actions are lawful only if the government shows they are "in furtherance of a compelling governmental interest" and "the least restrictive means of furthering that … interest." 42 U.S.C. § 2000bb-1(b). This inquiry—"strict scrutiny"—is "exceptionally demanding." *Singh*, 56 F.4th at 93. And it's "an 'affirmative defense' for which the Government bears the burden of persuasion." *Id.*; *see also O Centro*, 546 U.S. at 431.

Strikingly, in four years of litigation in *Apache Stronghold*, the government has never once attempted to prove up a strict-scrutiny defense. If it tries to do so here, Plaintiffs will at that time respond and explain why it fails. *See Mayorkas*, 567 F. Supp. 3d at 245 (by failing to offer compelling-interest argument, defendants "have conceded that argument, and they cannot meet their burden for that reason alone"). For present purposes, however, Plaintiffs note only that even assuming the government could show that obtaining this copper furthered a compelling

governmental interest—despite the availability of ample, reliable supplies of copper elsewhere— the planned project wouldn't be the "least restrictive means" of doing so. 42 U.S.C. § 2000bb- 1(b).

Indeed, the EIS itself demonstrates as much. As the EIS concedes, "there are other under- ground … techniques that could physically be applied to" the deposit that "could substantially re- duce impacts on surface resources." 4-EIS-F-3–4. These methods are "technically" and "physically feasible," and the government "agree[d]" about their benefits: namely, "the lack of a subsidence area overhead on Oak Flat, and the ability to backfill tailings underground." 4-EIS-F-5; 1-EIS-50. But the government rejected any detailed consideration of these alternatives on the ground that they "would result in higher per-ton mining costs" and thus "reduce the amount of ore that could be profitably mined." 1-EIS-50–51; 4-EIS-F-3–4.

This analysis turns RFRA's least-restrictive means requirement on its head. That requirement means that "[i]f the Government can achieve its interests without burdening religion, 'it must do so,'" *Singh*, 56 F.4th at 93 (quoting *Fulton*, 593 U.S. at 541)—not that doing so is optional if might marginally affect the government's interests (or a foreign mining company's profits). *See also Hobby Lobby*, 573 U.S. at 730 (RFRA may "require the Government to expend additional funds to accommodate citizens' religious beliefs"); *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 233 (1964) (to prevent constitutional violations, government can be required "to levy taxes to raise funds adequate to reopen, operate, and maintain" legally compliant school system).

Indeed, the government's claim that the alternative mining methods here wouldn't "typically" be used on similar deposits misses the point. 4-EIS-F-5. This deposit is not "typical" precisely because it lies beneath an irreplaceable sacred site. The whole point of RFRA is to treat govern- ment actions that burden religious exercise differently from those that don't, giving religious ex- ercise "very broad protection." *Hobby Lobby*, 573 U.S. at 685; *see also* 42 U.S.C. § 2000bb-1(a) (free exercise protected "even if the burden results from a rule of general applicability"). The gov- ernment is doing the opposite here—rejecting less restrictive alternatives in favor of a more de- structive one. Its actions violate RFRA.

**B.  The government's actions violate the Free Exercise Clause.**

RFRA aside, the government's actions also trigger strict scrutiny under the Free Exercise Clause, on two grounds. First, when the government imposes a free-exercise burden of a particular "character"—"substantially interfer[ing] with the religious development" of plaintiff "parents' children"—"strict scrutiny is appropriate regardless of whether the law is neutral or generally applicable." *Mahmoud*, 145 S. Ct. at 2361. Second, even under *Smith*, the government's actions here "do not meet the requirement of being neutral and generally applicable." *Fulton*, 593 U.S. at 533.

Thus, strict scrutiny applies, and the government cannot satisfy that test.

**1.  The government's actions trigger strict scrutiny by burdening Plaintiffs' First Amendment right to direct the religious upbringing of their children.**

In *Mahmoud*, the Supreme Court held that "regardless" of *Smith*, government actions are subject to strict scrutiny when they "substantially interfer[e] with the religious development" of children. 145 S. Ct. at 2361 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). *Mahmoud* involved parents of public-school children who requested to opt their children out of lessons involving "'LGBTQ+-inclusive' storybooks'" in an elementary school curriculum. Applying *Yoder*, the Supreme Court held that in a case where the burden the government has placed on religious exercise involves "the religious beliefs and practices that the parents wish to instill in their children," the usual Free Exercise question of whether the burden is applied pursuant to a neutral and generally applicable law "d[oes] not apply." *Id.* Because the government's actions imposed an "objective danger," or a "very real threat of undermining" the parents' religious exercise, the Supreme Court held that denying parents an opt-out from materials that contradicted the religious beliefs they wished to pass on to their children burdened the parents' religious exercise and must withstand strict scrutiny. *Id.* at 2349, 2355.

The relevant religious exercise here is the Plaintiff parents' ability to raise their children in accordance with their Apache religious beliefs, which includes worship, prayer, and religious ceremonies that take place at Oak Flat, and instructing their children on their spiritual connection to Oak Flat. *See supra* pp. 8-9. Core to that religious exercise is the parents' desire for their daughters to have a Sunrise Ceremony at Oak Flat to allow them to transition to womanhood in accordance

24

with their religious beliefs. *Id.* It did not matter in *Mahmoud* that the children were not "compelled to commit some specific practice forbidden by their religion." *Id.* at 2352. The Court held instead that the Free Exercise Clause provides "more than protection against compulsion or coercion to renounce or abandon one's religion." *Id.* at 2357–58. Just so here—the government's actions threaten the "specific religious beliefs and practices" the plaintiffs assert. *Id.* at 2353. The government's action, transferring an Apache sacred site for the purpose of turning it into a crater, poses an "objective danger" that will not only "undermin[e]" Plaintiffs' religious exercise, but will physically render it impossible forever. *Id.* at 2349, 2355. By preventing plaintiff parents and their children from conducting their sunrise ceremonies at Oak Flat, visiting sacred springs, gathering medicine, and holding sacred rituals at Oak Flat, the land transfer will put a full stop to Plaintiffs' ability to bring their children up according to their Apache religious beliefs.

In *Mahmoud*, the Supreme Court rejected the argument that the operation of public schools constituted governmental "internal affairs" with "incidental interference" in religious exercise. *Id.* at 2356–57 (quoting *Bowen v. Roy*, 476 U.S. 693, 699 (1986), and *Lyng*, 485 U.S. at 450). *Mahmoud* rejected reliance on *Lyng*, reasoning that "[t]he government's operation of the public schools is not a matter of 'internal affairs' akin to the administration of Social Security or the selection of 'filing cabinets.'" *Id.* Here, as in *Mahmoud*, the transfer of government land to a private entity is not simply the government's "internal affairs." It is a "direct, coercive" taking of what was once Apache land; it gives a private mining company the ability to exclude Plaintiffs and charge them with trespassing if they re-enter the land; and far from having mere "incidental" effects on religious exercise, its whole purpose is to undertake an action that will extinguish a time-honored religious exercise. *Id.* Even the *Mahmoud* dissent agreed that a burden would exist if the government's actions "would 'result in the destruction of [a religious] community as it exist[s] in the United States.'" *Id.* at 2392 (Sotomayor, J., dissenting). That is this case. If the "subtle" message of books in public school burdens religious exercise, then surely swallowing the birthplace of Western Apache religion in a crater and stopping Plaintiffs from ever worshipping there again does too. *Id.* at 2391.

### 2. The government's actions trigger strict scrutiny because they are neither neutral nor generally applicable.

Even aside from *Mahmoud*, under the Free Exercise Clause, government action burdening religion is shielded from strict scrutiny only if it constitutes a "valid and neutral law of general applicability." *Smith*, 494 U.S. at 879. Failing either the neutrality or general applicability requirement is sufficient to trigger strict scrutiny, *see Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 508 (2022)—"the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Here, the land-transfer statute is neither neutral nor generally applicable and therefore triggers strict scrutiny.

*First,* the land-transfer statute is not a neutral and generally applicable law because it reflects "a value judgment in favor of secular motivations, but not religious motivations." *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.). This is not a case in which the government passed an "across-the-board" statute that has "merely the incidental effect" of burdening religious exercise. *Smith*, 494 U.S. at 884, 878. Rather, the government was aware that "Oak Flat has always been and continues to be a place of profound religious … significance" where Apache "religious ceremonies" "continue to this day." *Resolution Copper: Hearing on H.R. 1904, The Southeast Arizona Land Exchange and Conservation Act of 2011, and S. 409, The Southeast Arizona Land Exchange and Conservation Act of 2009, Before the S. Comm. on Energy & Nat. Res*, 112th Cong. 32, 81 (2012), https://www.congress.gov/112/chrg/CHRG-112shrg75271/CHRG-112shrg75271.pdf. Yet the government passed the land-transfer statute anyway, with the bill's lead sponsor faulting the Apaches for "car[ing] more about some issues than they do about the prospect of employment." *Id.* at 4. That deliberate choice to treat "secular activity"—Resolution's copper mining—"more favorably than religious exercise"—by Apaches like Plaintiffs—is exactly the sort of value judgment that "trigger[s] strict scrutiny under the Free Exercise Clause." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

*Second*, the land-transfer statute is not neutral and generally applicable because it "targets" the site of Apache worship, and only this land, "for distinctive treatment." *Church of Lukumi Babalu*

*Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534, 536 (1993). As other courts have already explained, government action is not "generally applicable" if its "entire purpose" is to regulate only a "particular property." *Roman Catholic Bishop v. City of Springfield*, 724 F.3d 78, 98 (1st Cir. 2013); *see also Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1066 (9th Cir. 2011) ("individualized" zoning decision not "generally applicable"). *Cf. Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983) ("special tax that applies only to certain publications" was not "generally applicable"). That perfectly describes this case: The transfer and destruction of Oak Flat is not the result of a "generally applicable" law; it is the result of a one-off, individualized land-exchange rider addressing a single piece of land. *See* § 3003, 128 Stat. 3292, 3732; *cf. Nw. Indian Cemetery Protective Ass'n v. Peterson*, 795 F.2d 688, 689–90 (9th Cir. 1986), *rev'd sub nom*, *Lyng*, 485 U.S. 439 (challenged road proposed as part of general management plan for "76,500 acre[ ]" unit of a national forest). Such a law may well be constitutional— but if it burdens religious exercise, it is so only if it survives strict scrutiny.

### C. The government's actions violate NEPA.

NEPA requires the government to ensure its actions are consistent with the "broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); *see* 42 U.S.C. §§ 4321–4370. NEPA realizes these "sweeping policy goals" "through a set of 'action-forcing' procedures that require that agencies take a '"hard look" at environmental consequences'" before engaging in certain projects. *Robertson*, 490 U.S. at 350 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

The mine here is such a project. In fact, the land-transfer statute on its face instructs the Forest Service to "carry out the land exchange in accordance with the requirements of the National Environmental Policy Act" by preparing a "single environmental impact statement." § 3003(c)(9)(A) –(B), 128 Stat. 3735. By thus incorporating NEPA, Congress required the Forest Service to take a hard look at the land transfer's environmental consequences and then show its work in a "reasonable and reasonably explained" EIS. *Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1511 (2025).

Here, however, the EIS violates NEPA in two respects: (1) it exceeds NEPA's clear length limit; and (2) it fails to comply with NEPA's requirement to consider reasonable alternatives.

### 1. The EIS violates NEPA's length requirement.

Although an EIS must be sufficiently "detailed," it also must not "go[ ] on endlessly." *Seven Cnty.*, 145 S. Ct. at 1512 & n.3. In 2023, Congress took a significant step toward increasing public access to the government's environmental analyses—by imposing a default 150-page limit on notoriously "meander[ing]" EISs. *Id.* at 1512.[3] Congress's instruction could not be clearer: generally, "an environmental impact statement shall not exceed 150 pages, not including any citations or appendices"; for agency actions "of extraordinary complexity," the limit can go up to "300 pages." 42 U.S.C. § 4336a(e)(1)(A)-(B).

Here, although the EIS' text and appendices together contain roughly 2,400 pages, the Forest Service has categorized only 1,010 pages as substantive text. But even that is more than *six times* the default limit, and more than 700 pages longer than even the "extraordinary complexity" limit. No matter how one slices it, the EIS blatantly exceeds NEPA's page limit. That is "agency action[ ] … not in accordance with law." 5 U.S.C. § 706(2)(A). And it's little surprise why the government might choose to spill a sea of ink here—making it exceedingly difficult for the public, including Plaintiffs, to assess its compliance with NEPA while the 60-day clock ticks ever closer to the destruction of their sacred site. *See Seven Cnty.*, 145 S. Ct. at 1512 n.3 (page limit "strongly reinforces [NEPA's] basic principles").

### 2. The EIS fails to consider reasonable alternatives.

That said, just as "[b]revity should not be mistaken for lack of detail," *Id.* at 1512, verbosity should not be mistaken for analytical sufficiency. And here, the government neglected to "study, develop, and describe [in the EIS]" the "technically and economically feasible" alternatives to turning Oak Flat into a crater. 42 U.S.C. § 4332(F); *see also id.* § 4332(c)(iii) (requiring a "detailed statement" on "a reasonable range of alternatives to the proposed agency action, including an

---

[3]    The EIS in *Seven County* was published two years before NEPA was amended to add a length limitation, so the requirement did not impact that case. 145 S. Ct. at 1512 n.3.

analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal"). Despite purporting to consider alternative mining methods in Volumes 4 (Appendix F) and 6 (Appendix R), the EIS admitted to "eliminat[ing]" "alternative mining techniques" "from detailed analysis." 4-EIS-F-5. The Forest Service thus admittedly failed to give viable, publicly proposed alternatives the "hard look" NEPA requires, *Robertson*, 490 U.S. at 350, violating NEPA in at least three additional ways.

*First,* the government rejects the viability of alternative mining methods such as "underground stoping" or "cut-and-fill" on the grounds that "*almost no* alternative techniques … were identified as reasonable for an ore deposit with the characteristics of the Resolution deposit," 6-EIS-R-175, 180 (emphasis added), and "*very few* of these underground stoping methods have characteristics that are *well suited* to the Resolution copper deposit," 4-EIS-F-3 (emphases added). But these concessions raise more questions than they answer. For example, which of these alternative methods *are* "reasonable" and "well suited" to the deposit? and (2) if even a single method is "reasonable" and "well suited," why is it not being actively considered? But the government's implicit answer—a chart suggesting that all of the methods are inadequate, 4-EIS-F-3, 4—cannot be squared with the EIS's concession that there *are* "reasonable" and "well suited" alternatives that "technically … could be used." *Id.*

*Second,* the EIS claims the alternative mining alternatives are unreasonable because the proposed panel caving is a "standard mining method" "commonly used" to mine similar deposits and is thus the "appropriate method to be applied" to the Resolution Copper mine. 4-EIS-F-5. But this is merely an affirmative statement in support of the government's preferred, destructive method; it offers no reason for disqualifying the proposed alternative mining methods. Simply being "standard" or "common" does not make an option the only reasonable one. To the contrary, the facts of the case suggest that this deposit is a uniquely *non-standard* site with *uncommon* conditions—namely an exceptionally deep deposit beneath a major sacred site at risk of destruction. 1-EIS-3–4.

*Third,* the government's sweeping justification that no alternative mining method would be economically feasible is deficient. It relies upon a single datapoint: a financial figure, pulled without scrutiny from Resolution data, suggesting that alternative methods would "result in higher per-ton mining costs" and remove an "estimated 80 percent of the tonnage of the deposit from consideration." 4-EIS-F-5. And it treats profit as king—improperly dismissing the less-destructive alternative mining methods because they might "present[ ] only a partial solution to the stated purpose and need for the project." *City of Alexandria v. Slater*, 46 F. Supp. 2d 35, 42 (D.D.C. 1999). Namely, they might save the site from complete physical destruction but hurt Resolution's bottom line.[4] Even if Resolution's motives were unimpeachable, this would be an improper reason for the government to "eliminate an otherwise reasonable alternative." *Id.*

The EIS is also far from transparent about its rationale. After stating that alternative mining methods are economically infeasible, the EIS also states that the government "did not factor profitability into the analysis." 4-EIS-F-5. This explanation is not only nonsensical—for if Resolution's profits increase, its ability to pay for the mine increases too—but contradicted by the EIS itself. The reasoning provided considers the per-ton mining costs and their effects on company profits for their determination, 4-EIS-F-5—as it must. And it operates on the "basic assumption" that "using a technique with higher per-ton mining costs requires a higher ore grade"—when using a higher-grade ore could only be justified by securing profits. The government's covert prioritization of Resolution's financial interests only compounds its violations of NEPA.

### D. The government's actions violate the NHPA.

The NHPA requires that the federal government "take into account the effect of" any government "undertaking on any historic property" and "afford the [Advisory Council on Historic Preservation (ACHP)] a reasonable opportunity to comment." 54 U.S.C. § 306108. This process, called the Section 106 process, seeks to "identify historic properties potentially affected by the

---

[4]  Even providing for the estimated lower production levels suggested by the EIS, Resolution would still be able to mine and arguably produce tens of billions of dollars' worth of copper, meeting at least in part the purposes of the project.

undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects." 36 C.F.R. § 800.1(a); *City of Tacoma v. FERC*, 460 F.3d 53, 69 (D.C. Cir. 2006). If adverse effects on historic sites are identified, "the agency must continue consulting with the parties," *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 253 (3d Cir. 2001), and "avoid or mitigate any adverse effect," *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). And if an agreement between the ACHP and the agencies responsible for the government action cannot be reached as to a plan for mitigation, the agency "must make clear in the record that the ACHP's comments were taken seriously." *Friends of the Atglen-Susquehanna Trail*, 252 F.3d at 265.

The government can comply with Section 106 by coordinating with the ACHP through a programmatic agreement that outlines the mitigation efforts necessary for the project. 36 C.F.R. § 800(b)(2)(iii). But the agencies declined to do that here. *See* Letter from Rick Gonzalez, ACHP Vice Chairman, to Hon. Tom Vilsack, Sec'y of Agric. (Mar. 29, 2021), https://www.achp.gov/sites/default/files/2021-03/VilsackResolutionCopperLTR20210329.pdf ("ACHP Comments"). Instead, on January 15, 2021, the government released the first EIS with a version of a programmatic agreement that had not been signed by the ACHP. *Id.* at 4. Due to its exclusion, the ACHP terminated its Section 106 consultation with the agencies on February 11, 2021. *See* 36 C.F.R. § 800.7(a)(4). Accordingly, after the first EIS was withdrawn, the ACHP provided its comments and recommendations to the Secretary of Agriculture in a March 29, 2021 letter. The NHPA requires that "the head of the agency shall take into account the Council's comments in reaching a final decision on the undertaking." *Id.* § 800.7(c)(4).

The ACHP identified 43 sites eligible for the National Register that would be transferred to Resolution Copper and "permanently damaged by proposed mining operations." ACHP Comments at 3. The comments specifically focused on the *Chi'chil Bildagoteel* Historic District and emphasized that "[t]he historic significance of Oak Flat cannot be overstated." *Id.* at 5. The comments further concluded that the mitigation measures proposed by the programmatic agreement were "wholly inadequate in light of the magnitude of adverse effects to this and other historic

31

properties of such significance to numerous Indian tribes." *Id.* The ACHP recommended "immediate steps" to explore "any and all opportunities to amend or repeal" the NDAA. *Id.* at 6. Among other efforts to "minimize adverse effects," it recommended assessment of "more sustainable mining techniques in an effort to prevent subsidence at Oak Flat," and suggested that "USDA should employ all measures at its disposal to incentivize the consideration of such alternatives." *Id.* at 7.

Instead of adopting these measures, the Secretary of Agriculture decided to end the Section 106 process, publish the EIS, and initiate the 60-day deadline for transferring Oak Flat. On April 17, 2025, the USDA Secretary responded to the ACHP in a letter, declining to adopt the ACHP's recommended measures. Response Letter from Brooke L. Rollins, USDA Sec'y, to Reid Nelson, ACHP Exec. Dir. (Apr. 17, 2025), https://www.achp.gov/sites/default/files/2025-04/ResolutionCopperLetter417.pdf. The response provided no substantive discussion of the ACHP's suggested mitigation efforts, adopted none of them, and entirely failed to mention the specific suggestion of incentivizing alternate mining techniques that would prevent the crater from destroying the land at Oak Flat. *Id.*

The NHPA is "aimed solely at discouraging federal agencies from ignoring preservation values in projects they initiate." *Lee v. Thornburgh*, 877 F.2d 1053, 1056 (D.C. Cir. 1989). But here, the USDA has done just that. The government thus failed to comply with Section 106 by refusing to take sufficient account of the ACHP's comments, including by refusing to conduct studies of alternative mining methods that would have mitigated adverse effects on the historic and culturally significant land. Until the government "seriously" considers the ACHP's suggestions of alternative mining techniques by conducting a complete study of non-caving mining methods, the government's actions here—the promulgation of the EIS and the transfer of the land—should be held unlawful and "set aside." *Friends of the Atglen-Susquehanna Trail*, 252 F.3d at 265; 5 U.S.C. § 706(2).

## II. Plaintiffs satisfy the remaining preliminary injunction factors.

Besides likelihood of success on the merits, the Court must also consider the likelihood of "irreparable harm in the absence of preliminary relief," the "balance of the equities," and whether

preliminary relief is in "accord with the public interest." *League of Women Voters*, 838 F.3d at 6. Here, each consideration strongly favors Plaintiffs.

### A. Plaintiffs will be irreparably harmed.

The irreparable-harm inquiry here is straightforward. Both the Supreme Court and the D.C. Circuit have recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *see also Pursuing America's Greatness*, 831 F.3d at 511. So preliminary relief is appropriate if a party shows "that their 'First Amendment interests are either threatened or in fact being impaired at the time relief is sought.'" *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). These principles likewise extend to RFRA because "RFRA secures Congress' view of the right to free exercise under the First Amendment." *Tanzin*, 592 U.S. at 45; *see also Singh*, 56 F.4th at 109 (at least where government fails to identify "any relevant daylight," "a comparably irreparable injury applies to violations of RFRA") (collecting cases); *Fellowship of Christian Athletes v. District of Columbia*, 743 F. Supp. 3d 73, 93 (D.D.C. 2024) ("So too for RFRA claims." (citing *Singh*)).

Here, for the reasons already explained, Plaintiffs' First Amendment and RFRA rights are at minimum being "threatened" by the government's actions. *Media Matters*, 138 F.4th at 585. Plaintiffs, like other Apaches, exercise their religion at Oak Flat. Gouyen ¶¶ 22-23; Sinetta ¶¶ 22-23; Nomie ¶ 17; Angela ¶ 17. But in a matter of days, the government is planning to transfer Oak Flat to a copper mining company that intends to obliterate the site, ending Apache religious exercises not just temporarily, but forever. *Cf. Diocese of Brooklyn*, 592 U.S. at 1920 (pandemic-era restrictions that "effectively barr[ed] many from attending religious services" struck "at the very heart of the First Amendment's guarantee of religious liberty"). In the government's own words, the project will cause "permanent[ ]," "irreversible," and "irretrievable" harm. 2-EIS-837. Its impact on tribal resources will be "immediate, permanent, and large in scale." 3-EIS-892. If that isn't irreparable harm, it's hard to see what is.

Nor is the irreparable harm limited to completion of the mine. Rather, "even if the site won't be entirely cratered immediately after conveyance," "[o]nce the land is transferred, the Western Apaches will suffer immediate, irreparable harm." *Apache Stronghold*, 2021 WL 12295173, at *5 (Bumatay, J., dissenting). For one thing, the transfer will authorize Resolution Copper to immediately begin preparatory activities that are likely to degrade the Oak Flat environment. 1-EIS-61, Fig. 2.2.2-3. These activities include constructing "new shafts," "new roads," a "water treatment plant," an "admin building," and "substations." *Id.* And the transfer would "negate[ ] the ability of the Tonto National Forest to regulate [the] effects" of Resolution's activities there. 2-EIS-710, 781, 826.

Even more fundamentally, the transfer will immediately make Oak Flat "private property" that is "no longer … subject to [federal law] or Forest Service management that provides for tribal access." 3-EIS-871. Resolution will immediately have the power to restrict the timing and location of religious ceremonies there, if not to exclude Plaintiffs and other Apaches from the site altogether. And Defendants will surely argue that Plaintiffs' ability to challenge such actions will be curtailed or eliminated by the fact that "Oak Flat will be private property no longer subject to RFRA and other federal protections." *Apache Stronghold*, 101 F.4th at 1145 (Murguia, C.J., dissenting); *see also Apache Stronghold*, 2021 WL 12295173, at *6 (Bumatay, J., dissenting) ("[O]nce the land leaves the Government's hands, the Western Apaches likely cannot bring a RFRA or Free Exercise claim against Resolution Copper should the venture burden or extinguish their ability to worship or access Oak Flat.").

This irreparable harm—the transition of Oak Flat from a protected sacred site on federal land into the unprotected private property of a copper mining company—is as imminent as it gets: set to take place, absent this Court's intervention, on August 19. Given Plaintiffs' strong showing of success on the merits, "[t]here is no justification" for requiring Plaintiffs to "remain under a constant threat that" the land will be transferred and immediately and irreparably harmed. *Diocese of Brooklyn*, 592 U.S. at 20.

**B. The public interest and balance of equities favor enjoining the land transfer.**

When the Government is the defendant, the equities and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In First Amendment cases like this, the public interest and balance of equities point in Plaintiffs' favor because the public interest "always" favors the protection of constitutional rights. *Pursuing America's Greatness*, 831 F.3d at 511; *see also, e.g.*, *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("enforcement of an unconstitutional law is always contrary to the public interest").

Here, both the public interest and balance of equities favor Plaintiffs. "On the Plaintiffs' side of the balance is the weighty public interest in the free exercise of religion that RFRA protects." *Singh*, 56 F.4th at 107. That interest is at its apex here, where the government's action does not just make religious exercise more costly or hinder it temporarily, but rather threatens to destroy the core sacred site of an entire Native American religious tradition, permanently extinguishing centuries-old religious exercises. *See* 42 U.S.C. § 1996 (it is "the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the[ir] traditional religions … , including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites").

Meanwhile, unlike Plaintiffs who face serious irreparable harm in the absence of preliminary relief, delaying the transfer of Oak Flat causes no harm to the Government and furthers the public interest. The Government faces no urgency with the transfer, and, in fact, the transfer was proposed almost two decades ago and authorized by statute eleven years ago. *See* Gorsuch & Thomas, 145 S. Ct. at 1482–83. Further, in 2021, the Government unilaterally rescinded the original EIS, *Resolution Copper Project & Land Exchange Environmental Impact Statement: Project Update*, U.S. Department of Agriculture (Mar. 1, 2021), https://archive.ph/N65gZ, and its delay in republishing the EIS until 2025 underscores that preliminary relief delaying the transfer causes no harm to the government. All the copper the government seeks to have mined will still be there by the time this case is litigated.

Without preliminary relief, Plaintiffs face serious harm to their religious exercise that is immediate, permanent, and irreversible. A preliminary injunction protecting Oak Flat would cost the government nothing, but permitting the government to transfer the land would immediately and irreversibly harm Plaintiffs' religious exercise.

## CONCLUSION

The Court should grant Plaintiffs' motion for preliminary injunction and enjoin Defendants from conveying any right, title, or interest of the United States in Oak Flat to Resolution Copper, or otherwise allowing or authorizing Resolution Copper to take any action affecting the physical integrity of Oak Flat, during the pendency of this case.

Respectfully submitted,

*/s/ Christian J. Myers*
Christian J. Myers (Bar ID: 1658355)
Madeline Bergstrom*
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
(202) 689-2807
josh.myers@nelsonmullins.com
madeline.bergstrom@nelsonmullins.com

  *application for admission forthcoming

Miles E. Coleman *†
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 W. Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

  *application for admission pending
  †application for admission *pro hac vice* forthcoming

Jeffrey A. Wald†
Nelson Mullins Riley & Scarborough LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
jeffrey.wald@nelsonmullins.com

  †application for admission *pro hac vice* forthcoming

*Counsel for Plaintiffs*

36

**Table of Excerpts from the 2025 Final Environmental Impact Statement**

| EIS Cite | Excerpt |
|---|---|
| **VOLUME 1** ||
| 1-EIS-ES-28 | "The NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP would be directly and permanently damaged by the subsidence area at the Oak Flat Federal Parcel." |
| 1-EIS-ES-29 | "Under all action alternatives, the Oak Flat Federal Parcel will be adversely impacted by the proposed mining operation. Extraction of the ore via block caving will eventually lead to the subsidence of the parcel; access to Oak Flat and the subsidence zone will be curtailed once it is no longer safe for visitors. Several springs located on the Oak Flat Federal Parcel will be lost due to the development of the subsidence area. The subsidence has a high potential to directly and permanently adversely affect numerous cultural resources sites, including the following: archaeological resources; areas with sacred values such as springs, seeps, and prayer locations; resource gathering sites; ancestor burial sites; traditional ceremonial and dance locations; and other places of spiritual and cultural significance to members of federally recognized Tribes." |
| 1-EIS-12 | "The land surface overlying the copper deposit is located in an area that has a long history of use by Native Americans, including the Apache, O'odham, Puebloan, and Yavapai people . . . ." |
| 1-EIS-13 | "As the ore moves downward and is removed, the land surface above the ore body also moves downward or 'subsides.' Analysts expect a 'subsidence' zone to develop near the East Plant Site; there is potential for downward movement to a depth between 800 and 1,115 feet. Resolution Copper projects the subsidence area to be up to 1.8 miles wide at the surface." |
| 1-EIS-34 | "[T]ailings storage facilities are permanent and remain part of the landscape in perpetuity." |
| 1-EIS-44 | "Construction and operation of the mine would profoundly and permanently alter the NRHP-listed *Chí'chil Biłdagoteel* (Oak Flat) . . . . In addition, development of the proposed tailings storage facility at any of the four proposed or alternative locations would permanently bury or otherwise destroy many prehistoric and historic cultural artifacts, potentially including human burials." |
| 1-EIS-46 | "Construction and operation of the Resolution Copper Mine would, as a result of anticipated geological subsidence at the East Plant Site, permanently alter the topography and scenic character of the Oak Flat area." |
| 1-EIS-60 | "Development of the Resolution Copper Mine would directly and permanently damage the NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP. . . . |

| | Dewatering or direct disturbance would impact between 18 and 20 GDEs, mostly sacred springs. . . . Burials are likely to be impacted; the numbers and locations of burials would not be known until such sites are detected as a result of mine-related activities. Under this or any action alternative, one or more Emory oak groves at Oak Flat, used by Tribal members for acorn collecting, would likely be lost." |
|---|---|
| 1-EIS-62 | "Approximately 1.37 billion tons of tailings would be created during the mining process and would be permanently stored at the tailings storage facility." |
| 1-EIS-89 | "Reclamation activities would not occur within the subsidence area. There would be a berm and/or fence constructed around the perimeter of the continuous subsidence area." |
| 1-EIS-153 | "All public access . . . would be eliminated on 8,423 acres." |
| 1-EIS-158 | "The NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP would be directly and permanently damaged." |
| 1-EIS-160 | "Development of the Resolution Copper Mine would directly and permanently damage the NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP. . . . Dewatering or direct disturbance would impact between 18 and 20 GDEs, mostly sacred springs. . . . Burials are likely to be impacted; the numbers and locations of burials would not be known until such sites are detected as a result of mine-related activities. Under this or any action alternative, one or more Emory oak groves at Oak Flat, used by Tribal members for acorn collecting, would likely be lost. Other unspecified mineral- and/or plant-collecting locations would also likely be affected; historically, medicinal and other plants are frequently gathered near springs and seeps, so drawdown of water at these locations may also adversely affect plant availability." |
| 1-EIS-191–92 | "The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources from the proposed mine and block caving. . . . If the land exchange does not occur, not only would mineral exploration not take place within the 760-acre Oak Flat Withdrawal Area, but subsidence caused by block caving would not be allowed to impact the Withdrawal Area." |
| 1-EIS-255 | "The primary impacts on vegetation communities during construction of the action alternatives would be associated with removal and/or crushing of natural, native species; increased potential for noxious and invasive weed establishment and spread; decreased plant productivity from fugitive dust; plant community fragmentation; and changes in plant growth and seasonal phenology from artificial lighting." |

38

| 1-EIS-327 | "The land exchange would have significant effects on transportation and access. . . . [P]ublic access would be lost to the parcel itself, as well as passage through the parcel to other destinations, including Apache Leap and Devil's Canyon." |
|---|---|
| **VOLUME 2** | |
| 2-EIS-454 | "Mine dewatering at the East Plant Site under all action alternatives would result in the same irretrievable commitment of 160,000 acre-feet of water from the combined deep groundwater system and Apache Leap Tuff aquifer over the life of the mine. . . . [E]ven if the water sources are replaced, the impact on the sense of nature and place for these natural riparian systems would be irreversible. In addition, the GDEs directly disturbed by the subsidence area or tailings alternatives represent irreversible impacts." |
| 2-EIS-564 | "Seepage from the tailings storage facilities has several unavoidable adverse effects. In all cases, the tailings seepage adds a pollutant load to the downstream environment. . . . The potential impacts on water quality from tailings seepage would cause an irretrievable commitment of water resources downstream of the tailings storage facility, lasting as long as seepage continued." |
| 2-EIS-598 | "With respect to surface water flows from the project area, all action alternatives would result in both irreversible and irretrievable commitment of surface water resources." |
| 2-EIS-617 | "The entire subsidence area would be fenced for public safety." |
| 2-EIS-643 | "The direct loss of productivity of thousands of acres of various habitat from the project components would result in both irreversible and irretrievable commitment of the resources." |
| 2-EIS-663 | "The land exchange would have significant effects on recreation. . . . Additional recreational activities that would be lost include camping at the Oak Flat campground, picnicking, and nature viewing. The campground currently provides approximately 20 campsites and a large stand of native oak trees." |
| 2-EIS-759 | "[O]nce the land exchange occurs, Resolution Copper could use hazardous materials on this land without approval." |
| 2-EIS-812–13 | "For all action alternatives, there would be an irretrievable loss of scenic quality from increased activity and traffic during the construction and operation phases of the mine. . . . There would be an irretrievable, regional, long-term loss of night-sky viewing during project construction and operations because night-sky brightening, light pollution, and sky glow caused by mine lighting would diminish nighttime viewing conditions in the direction of the mine." |

| 2-EIS-820 | "In consultation with SHPO, ACHP, Tribes, and other consulting parties, the Forest Service determined that the project will have an adverse effect on historic properties. Resolution of adverse effects (36 CFR 800.6) involves the agency consulting with SHPO, Tribes, and other consulting parties to develop strategies to avoid, minimize, or mitigate adverse effects on historic properties." |
|---|---|
| 2-EIS-822 | "The project area is within the traditional territories of the Western Apache, the Yavapai, and the Akimel O'odham or Upper Pima. The histories of the Western Apache—a group that includes ancestors of the White Mountain, San Carlos, Cibecue, and Tonto Apache—tell of migrations into Arizona where they encountered the last inhabitants of villages along the Gila and San Pedro Rivers. The Western Apache practiced a mixed subsistence strategy of farming in the summer in the north, and hunting and gathering in the winter in the south. In the 1870s, the Apache were forced onto reservations, which curtailed much of their seasonal round. However, not all Apache stayed on the reservations, and some continued to use the vicinity of the project area into the twentieth century." |
| 2-EIS-826 | "The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources. If the land exchange occurs, 41 NRHP-eligible archaeological sites and one TCP within the selected lands would be adversely affected. . . . [H]istoric properties leaving Federal management is considered an adverse effect, regardless of the plans for the land, meaning that, under NEPA, the land exchange would have an adverse effect on cultural resources." |
| 2-EIS-834 | "[E]ven if recorded and documented, loss of these cultural sites contributes to the overall impact to the cultural heritage of the areas. . . . While the footprint of these projects is used as a proxy for impacts to cultural resources, effects on cultural resources extend beyond destruction by physical disturbance." |
| 2-EIS-836 | "Cultural resources and historic properties would be directly and permanently impacted. These impacts cannot be avoided within the areas of surface disturbance, nor can they be fully mitigated." |
| **VOLUME 3** | |
| 3-EIS-867 | "No Tribe supports the desecration/destruction of ancestral sites. Places where ancestors have lived are considered alive and sacred. It is a Tribal cultural imperative that these places should not be disturbed or destroyed for resource extraction or for financial gain. Continued access to the land and all its resources is necessary and should be accommodated for present and future generations. . . . The Resolution Copper Mine and Southeast Arizona Land Exchange has a high potential to directly and permanently adversely affect numerous cultural resources sites, including archaeological resources, areas with sacred values, and other |

| | |
|---|---|
| | places of spiritual and cultural significance to members of federally recognized Tribes." |
| 3-EIS-868 | "We received numerous comments from Tribal members about the sacredness and importance of Oak Flat to them, their lives, their culture, and their children. Many expressed their sadness and anger that their sacred place would be destroyed and that they would lose access to their oak groves and ceremonial grounds." |
| 3-EIS-871 | "***Direct impacts*** on resources of traditional cultural significance (archaeological sites; burial locations; spiritual areas, landforms, viewsheds, and named locations in the cultural landscape; water sources; food, materials, mineral, and medicinal plant gathering localities; or other significant traditionally important places) would consist of damage, loss, or disturbance . . . . [T]he land exchange will have an adverse impact on resources significant to the Tribes." |
| 3-EIS-873 | "In 2015, the Tonto National Forest, in partnership with the San Carlos Apache Tribe, composed a nomination for Oak Flat, the area originally known as *Chí'chil Bildagoteel*, to be listed in the NRHP as a TCP (Nez 2016). . . . Places like springs, ancestral (archaeological) sites, plants, animals, and mineral resource locations are sacred and should not be disturbed or disrupted. The Oak Flat Federal Parcel slated to be transferred to Resolution Copper was once part of the traditional territories of the Western Apache, the Yavapai, the O'odham, and the Puebloan Tribes of Hopi and Zuni. They lived on and used the resources of these lands until the lands were taken by force 150 years ago." |
| 3-EIS-874–75 | "After the signing of the Treaty of Guadalupe in 1848 . . . Euro-American settlers began arriving in Western Apache lands in search of mineral wealth and ranching lands. . . . Several massacres of Apache by soldiers and civilians occurred from the 1850s through the 1870s, including the reported events at Apache Leap. In the 1870s, the Apache were forced off their lands and onto reservations. . . . All these communities lost large portions of their homelands, including Oak Flat, and today live on lands that do not encompass places sacred to their cultures. . . . Knowing these places is vital to understanding Apache history and, therefore, identity. For the Western Apache, 'the people's sense of place, their sense of the tribal past, and their vibrant sense of themselves are inseparably intertwined' (Basso 1996). The Apache landscape is imbued with diyah, or power (Basso 1996). Diyah resides in natural phenomenon like lightning, in things like water or plants, and in places like mountains. Gáán, or holy beings, live in important natural places and protect and guide the Apache people (Hilpert 1996). They come to ceremonies to impart well-being to Apache, to heal, and to help the people stay on the correct path." |

| 3-EIS-879 | "[T]he Tribal Monitors recorded 594 special interest areas in the direct analysis area. Of the 594, 523 are described as cultural resources, 66 as natural resources, and five as both cultural and natural resources. The cultural resources generally correspond to prehistoric archaeological sites and were categorized by the Tribal Monitors as cultural areas, settlement areas, resource gathering areas, resource processing areas, agricultural areas, and other." |
|---|---|
| 3-EIS-885 | "Distinctive features of the TCP include an Emory oak stand that the Apache and Yavapai use to harvest acorns, plus a nearby campground, constructed by the Civilian Conservation Corps, that provides a convenient place for family gatherings. Four of the places of traditional and cultural importance identified in the ethnographic report are found within the Oak Flat Federal Parcel; they are all part of the TCP. Two additional places of traditional and cultural importance are found within the East Plant Site of the GPO. All of these resources would be adversely affected by leaving Federal management, which would result in a high potential to directly and permanently adversely affect numerous cultural resources sites, including the following: archaeological resources; areas with sacred values such as springs, seeps, and prayer locations; resource gathering sites; ancestor burial sites; traditional ceremonial and dance locations; and other places of spiritual and cultural significance to members of federally recognized Tribes." |
| 3-EIS-890–92 | "Maintaining access to Oak Flat campground . . . . represents only a small portion of Oak Flat and would not reduce the impact on Tribal cultural heritage caused by the destruction of the broader landscape due to the subsidence area. . . . Significant Tribal properties and uses would be directly and permanently impacted. These impacts cannot be avoided within the areas of direct impact, nor can they be fully mitigated." |
| 3-EIS-892 | "Physical and visual impacts on TCPs, special interest areas, and plant and mineral resources caused by construction of the mine would be immediate, permanent, and large in scale. Mitigation measures cannot replace or replicate the Tribal resources and TCPs that would be destroyed by project construction and operation. The landscape, which is imbued with specific cultural attributions by each of the consulting Tribes, would also be permanently affected. . . . The direct impacts on the TCP and special interest areas from construction of the mine and associated facilities constitute an irreversible commitment of resources. TCPs cannot be reconstructed once disturbed, nor can they be fully mitigated. Sacred springs would be eradicated by subsidence or construction of the tailings storage facility, and affected by groundwater drawdown. Changes that permanently affect the ability of Tribal members to access the TCP and special interest areas for cultural and religious purposes also consist of an irreversible loss of resources. For uses such as gathering traditional materials from areas that would be within the |

| | |
|---|---|
| | subsidence area or the tailings storage facility, the project would constitute an irreversible loss of resources." |
| **VOLUME 4** | |
| 4-EIS-F-3 | "While there are other underground stoping techniques that could physically be applied to the Resolution copper deposit, each of the alternative underground mining methods assessed was found to have higher operational costs than panel caving." |
| 4-EIS-F-4 | "The Forest Service recognizes and acknowledges scoping comments that suggest that the use of mining techniques other than panel caving could substantially reduce impacts on surface resources, both by reducing or eliminating subsidence and by allowing the potential for backfilling tailings underground." |
| **VOLUME 6** | |
| 6-EIS-U-1 | "This appendix contains the testimony of Tribal members describing the spiritual significance of Oak Flat and what its loss would mean to their culture, especially Apache culture, in their own words." |
| 6-EIS-U-1 | "For as long as may be recalled, our People have come together here. We gather the acorns and plants that these lands provide, which we use for ceremonies, medicinal purposes, and for other cultural reasons. . . . These are holy, sacred, and consecrated lands which remain central to our identity as Apache People." |
| 6-EIS-U-2–3 | "*Chí'chil Bildagoteel* (also known as Oak Flat) is a Holy and Sacred site . . . where we pray, collect water and medicinal plants for ceremonies, gather acorns and other foods, and honor those that are buried here. . . . Emory oak groves at Oak Flat used by tribal members for acorn collecting are among the many living resources that will be lost along with more than a dozen other traditional plant medicine and food sources. . . . The impacts that will occur to Oak Flat will undeniably prohibit the Apache people from practicing our ceremonies at our Holy site. . . . Our connections to the Oak Flat area are central to who we are as Apache people. Numerous people speak of buried family members. . . . The destruction to our lands and our sacred sites has occurred consistently over the past century in direct violation of treaty promises and the trust obligation owed to Indian tribes. . . . [T]he United States incurred obligations to protect our lands from harm, and to respect our religion and way of life. Despite these obligations, the U.S. Government has consistently failed to uphold these promises or too often fails to act to protect our rights associated with such places like *Chí'chil Bildagoteel*." |
| 6-EIS-U-3 | "Throughout our history, Oak Flat continues as a vital part of the Apache religion, traditions, and culture. In Apache, our word for the area of Oak Flat is |

| | |
|---|---|
| | *Chí'chil Biłdagoteel* (a 'Flat with Acorn Trees'). Oak Flat is a holy and sacred site, and a traditional cultural property with deep religious, cultural, archaeological, historical and environmental significance to Apaches, Yavapais, and other tribes. At least eight Apache Clans and two Western Apache Bands have documented history in the area. . . . A number of Apache religious ceremonies will be held at Oak Flat this Spring, just as similar ceremonies and other religions and traditional practices have been held for a long as long as Apaches can recall. We do so because Oak Flat is a place filled with power, a place Apaches go: for prayer and ceremony, for healing and ceremonial items, or for peace and personal cleansing. . . . In the Oak Flat area, there are hundreds of traditional Apache species of plants, birds, insects, and many other living things in the Oak Flat area that are crucial to Apache religion and culture. . . . Only the species within the Oak Flat area are imbued with the unique power of this area." |
| 6-EIS-U-4 | "In the late 1800s, the U.S. Army forcibly removed Apaches from our lands, including the Oak Flat area, to the San Carlos Apache Reservation. We were made prisoners of war there until the early 1900s. Our people lived, prayed, and died in the Oak Flat area. . . . Since time immemorial, Apache religious ceremonies and traditional practices have been held at Oak Flat. Article 11 of the Apache Treaty of 1852, requires the United States to 'so legislate and act to secure the permanent prosperity and happiness' of the Apache people.<br><br>Clearly, H.R. 687 fails to live up to this promise." |
| 6-EIS-U-6 | "How can we practice our ceremonies at Oak Flat when it is destroyed? How will the future Apache girls and boys know what it is to be Apache, to know our home when it is gone?" |
| 6-EIS-U-6 | "*Chí'chil Biłdagoteel* . . . is a place where we pray, collect water and medicinal plants for ceremonies, gather acorns and other foods, and honor those that are buried here. We have never lost our relationship to *Chí'chil Biłdagoteel*." |
| 6-EIS-U-7 | "My nine year old daughter dreams about having her Apache Sunrise dance ceremony at Oak Flat. The Apaches see Oak Flat differently—it is a church, a place for worship and the practice of our traditional religion. It is the center of our most sincerely held, religious beliefs, where diyi' (sacred power) can be called upon via prayers. . . . At least eight Apache clans have direct ties to this location. Tribal members continue to visit Oak Flat for prayer and a wide range of traditional needs and practices." |
| 6-EIS-U-7 | "I pray my son will have the opportunity to sweat at Oak Flat for the first time, when he becomes a young man. We have gone to many Apache spiritual ceremonies (Sunrise dances and Holy ground ceremonies) at Oak Flat." |

| 6-EIS-U-8 | "My family, my ancestors come from Oak Flat. I grew up there, praying, picking the medicine, picking the acorn, going to the springs, gaining the teachings of my role as an Apache woman so I can pass it down to my daughters. . . . My daughter, Nizhoni, held her Ceremony at Oak Flat in October 2014. . . . All the elements of the wind, fire, water, and land go into the Ceremony for my daughter. Everything Usen (Creator, God) has created has a significant role in the Ceremony got the 4 days that she prays, dances, connects with all the elements, connected to our ancestors, connected to the Holy Spirit. On the 3rd day of the Ceremony she is painted white with the white clay that is provided from Mother Earth, and that paint blesses all living beings, followed by the next day, the last day of the ceremony, she has to wash the paint off and give it back to the earth. . . . The exact springs she went to wash her paint off is being affected by Resolution Copper Mine already by dewatering the springs. You are already tampering with her life." |
|---|---|
| 6-EIS-U-9 | "For at least a half millennium through to the present day, members of our Tribe have utilized the Oak Flat area for traditional religious ceremonies, such as the Sunrise Dance . . . . It is a place where Apache Holy Ground rituals occur, where we commune with and sing to our Creator God, and celebrate our holy spirits, including our mountain spirits, the Ga'an. It is a place filled with rock paintings and petroglyphs, what some may describe as the footprints and the very spirit of our ancestors, hallmarks akin to the art found in gothic cathedrals and temples, like the Western Wall in Jerusalem, St. Peter's Basilica in Vatican City, or Angor Wat in Cambodia. This is why I call Oak Flat the Sistine Chapel of Apache religion." |
| 6-EIS-U-9 | "I just recently had my coming of age ceremony at Oak Flat and being there meant a lot to me to have my ceremony in a place where all my ancestors used to be. If the Resolution Copper mine continues with destroying Oak Flat, then I will never have a sacred place to come back to or to show my kids where our ancestors gathered." |
| 6-EIS-U-10 | "Oak Flat is so important to me is because I have a very strong connection with the land. Oak Flat gives me connection with my family and my past ancestors." |
| 6-EIS-U-10 | "Oak Flat is also a place where our members still conduct traditional harvesting of plants important to our diet, such as acorns from Emory oaks, and healing plant-based medicines for a wide range of ailments." |
| 6-EIS-U-10 | "The numerous natural elements, that come from these Holy Sites, are used as tools to conduct Religious Ceremonies, spiritual sweats, and Sunrise Ceremonies." |